1  MATTHEW R. WALSH
2  19197 GOLDEN VALLEY RD #333
3  SANTA CLARITA, CA 91387
4  (661) 644-0012

5  Plaintiff In Pro Per,

6  ## UNITED STATES DISTRICT COURT

7  ## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW R. WALSH<br>19197 GOLDEN VALLEY RD #333<br>SANTA CLARITA, CA 91387,<br><br>       Plaintiff In Pro Per,<br><br>vs.<br><br>ROKOKO ELECTRONICS<br>(AND DOES 1 THROUGH 50, INCLUSIVE)<br>31416 AGOURA RD STE 118<br>WESTLAKE VILLAGE, CA<br>91361<br><br>       Defendant | Case No.: 2:25-CV-05340-ODW-RAO<br><br>Before: Hon. Otis D. Wright II<br>Courtroom 5D<br><br>Hearing date: August 4, 2025<br>Hearing time: 1:30PM<br>Place: Dept. 5D<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Filed concurrently with:<br>- Memorandum of Points and Authorities<br>- Supplemental declaration of Matthew R. Walsh |

8
9

10  ## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

11

12  TO THE CLERK OF THE  COURT AND TO DEFENDANT(S) AND THEIR COUNSEL OF

13  RECORD:

14

15  **PLEASE TAKE NOTICE** that Plaintiff without waiving any arguments hereby opposes

16  Defendant's Motion to Dismiss.

PAGE 1

# **TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................6

II. LEGAL STANDARD ..........................................................................................6

1.L.R. 7-3 – Pre-Filing Conference of Counsel: Requires parties to meet and confer at least 7 days before filing certain motions, including motions to dismiss.........7

2.L.R. 11-3.1 – Format Requirements: Mandates use of consecutively numbered lines in pleadings. ..............................................................................................7

3.L.R. 7-5(a) – Motions Must Include Points and Authorities: Requires a motion be accompanied by a memorandum of points and authorities. ...............................7

4.L.R. 11-7 – Appendices and Attachments: Specifies how exhibits and appendices must be formatted and separated from the body of the brief...............................7

5.L.R. 11-8 – Use of Headings and Subheadings: Requires properly structured and labeled headings to ensure clarity and compliance. ..............................................7

6.L.R. 11-6.1 & 11-6.2 – Word Count Certification: Requires accurate certification of word counts for memoranda, under penalty of sanctions. ...............................7

7. L.R. 11-9 – Certification Statements: False certifications may be sanctionable under local rule authority. .........................................................................................7

8.Civ § 1793.03 – Mandatory Availability of Parts and Service: Requires manufacturers to make parts and repair information available for at least seven years after product manufacture. ................................................................................7

9....Civ § 1761(d) – CLRA Definition of "Consumer": Defines a consumer as an individual acquiring goods/services for personal, family, or household purposes. ...7

10.Civ § 1670.5(a) – Unconscionable Contracts – Judicial Power: Permits courts to refuse to enforce a contract (or any clause) found to be unconscionable at the time made. .................................................................................................................7

11..Civ § 1670.5(b) – Evidence of Unconscionability: Entitles parties to present evidence on a contract's commercial setting, purpose, and effect when unconscionability is claimed. ...................................................................................8

12.CCP § 1770 – CLRA – Prohibited Acts: Lists unfair or deceptive acts in transactions intended for personal, family, or household use. ............................8

13.PC § 631(a) – Wiretapping and Eavesdropping: Prohibits unauthorized wiretapping or interception of communications...................................................8

14.PC § 502(c)(1) – Unauthorized Access: Prohibits knowingly accessing and using any data from a computer system without permission. ..............................8

15.PC § 502(c)(1)(b) – Theft of Data or Intellectual Property: Targets unauthorized use or taking of data or programs. .........................................................................8

16. PC § 502(c)(2) – Knowingly Accessing Data to Defraud or Obtain Value: Prohibits fraudulently accessing systems or data. ........................................................8

17. PC § 502(c)(7) – Introduction of Malware or Harmful Code: Outlaws transmission of code intended to disrupt or damage computers. ........................8

18. PC § 502(c)(13) – Altering, Deleting, or Destroying Data: Prohibits unauthorized tampering with digital files or information. ........................8

19. PC § 502(e)(1)(A) – Civil Remedies for Violations: Allows private individuals to bring civil actions for violations of § 502. ........................8

20. PC § 502(e)(1) – Private Right of Action: Grants standing to any person harmed by computer-related offenses under § 502. ........................8

21. 15 U.S.C. § 1125(a) – Lanham Act – False Advertising: Prohibits false or misleading advertising that harms consumers or competitors. ........................8

22. 17 U.S.C. § 102 – Copyright Protection: Protects original works of authorship fixed in a tangible medium. ........................9

23. 17 U.S.C. § 101 – Definition of Publication: Defines "publication" in the context of copyright timing and enforcement. ........................9

24. 17 U.S.C. § 412(2) – Prerequisite for Infringement Remedies: Requires timely registration of works to be eligible for statutory damages and attorneys' fees. ....9

25. 17 U.S.C. § 1202(b)(1) – DMCA – Removal of Copyright Management Information (CMI): Prohibits the unauthorized removal or alteration of CMI when done to facilitate or conceal infringement. ........................9

26. 17 U.S.C. § 1203(c)(3)(B) – Statutory Damages for DMCA Violations: Provides enhanced damages for willful DMCA violations. ........................9

27. 18 U.S.C. § 1030 – Computer Fraud and Abuse Act (CFAA): Prohibits unauthorized access to protected computers and provides civil remedies. ..........9

28. . New York Times v Microsoft Corporation – Copyright/intellectual property case ........................9

29. Electronic Communications Privacy Act (ECPA) – Privacy of Communications: Protects wire, oral, and electronic communications while in transit and when stored. ........................9

III. ARGUMENT ........................9

1. Plaintiff Fails To Properly Plead His Tortious Interference Claim. ........................9

2. " No contracts exist" ........................9

3. "Plaintiff does not allege Rokoko had any actual knowledge" ....................11

4. "Plaintiff has failed to allege any intentional actions" ................................11

5. "Plaintiff has not pled any facts demonstrating that the purported contracts were actually disrupted" ........................................12

6. "or that he has suffered economic harm"......................................12

7. "Plaintiff's speculative and attenuated allegations that "[s]imilar game productions . . . can expect $9M - $18M for moderate success, $30M in success" are not sufficient."....................................................13

8. "Either the economic relationship with a third party is too attenuated or the probability of economic benefit too speculative." ............................13

9. Plaintiff's Claim For Violations Of The Song-Berverly Act Fail As A Matter Of Law..14

10. "Consumer goods" within the meaning of the Song-Beverly Act is limited to "any new product or part thereof that is used, bought, or leased for use for personal, family, or household purposes."........................................14

11. .."Plaintiff purchased the Rokoko products for commercial use, not personal use" ........................................................................15

12. "Plaintiff could state a cognizable claim for consumer goods under the Song-Beverly Act—he cannot—such a claim is barred because he did not bring his claim within one year after purchasing the products." ...................................15

13. "claim for breach of implied warranty under Song-Beverly Act accrues upon delivery".................................................................16

14. "Beverly claim relates to Rokoko's Services, Rokoko has expressly disclaimed any warranties and the SongBeverly Act is therefore inapplicable" ...............17

15. Plaintiff False Advertising Claim Fails As A Matter Of Law ..............................18

16. "Plaintiff's use of Rokoko's Services are provided "as-is" and without warranty".................................................................18

17. "such statements are not false or misleading, and therefore do not sufficiently support a cause of action for false advertising.". ...............................18

18. Plaintiff's Claims For UCL And CLRA Fail As A Matter Of Law............21

19. Plaintiff Has Not Alleged That Rokoko Was Aware Of A Defect At The Time Of Sale .................................................................21

20. Plaintiff Is Not A "Consumer" Within The Meaning Of CLRA ................21

21. Plaintiff admits that he purchased products from Rokoko for his professional use, not for "personal, family, or household purposes."................................22

22. "Plaintiff Failed To Comply With CLRA's Pre-Suit Notice Requirements" ........22

23. .."Plaintiff's UCL Claim Is Derivative Of His CLRA and Song-Beverly Act Claims" .................................................................23

24. "Plaintiff's Claim For "Misappropriation Of Intellectual Property" Fails As A Matter Of Law" ................................................................24

25. "Plaintiff Has Not Identified Any Purported Trade Secret With The Requisite Specificity." ................................................................24

26. "Plaintiff Has Failed To Plead A Misappropriation" ..................................25

27. "Plaintiff's Intellectual Property Infringement Claim Fails As A Matter Of Law" 26

28. "Plaintiff Fails To State A Claim Under the DMCA" ..............................27

29. ..."Plaintiff Lacks Standing Due To Failure To Allege A Cognizable Injury" ..27

30. "Plaintiff Fails To State A Claim Under § 1202(b)(1)" ...........................27

31. ...."Plaintiff's "Unconscionable Contract Terms" Claim Fails As A Matter Of Law" ..30

32. "Plaintiff's Claim For "Illegal Deployment Of Code & Privacy Violations" Fails As A Matter Of Law." ................................................................31

33. "Plaintiff's Fraud-Based Claims Fail As A Matter Of Law" ................................33

34. ..."Plaintiff Has Not Sufficiently Pled Claims For Fraud In The Inducement, Fraudulent Misrepresentation Or Fraudulent Concealment." .........................33

35. "Plaintiff's Fraud Claims Are Also Barred By The Economic Loss Doctrine" ................................................................34

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

a. ) Plaintiff respectfully files this <u>opposition</u> to Defendant's Motion to Dismiss to only adhere to Court required timelines, however, that motion is procedurally improper as it violates Local Rules 7-3 ("failure to meet and confer"), 11-3.1 ("lacking consecutive line numbers"), 7-5(a) ("no memorandum of points and authorities"), ("lacking a brief but complete memorandum .. and the points and authorities"), 11-7 ("Appendices are mixed with the body"), 11-8 ("headings and subheadings missing"), 11-6.1 ("false word count"), and 11-6.2 ("false word count on certificate"), further the fact that it contains a false certification statement to the court according to Local Rule 11-9 carries sanctions.

b. ) Plaintiff respectfully submits this Opposition solely to preserve the record and does not concede that this Court has proper subject-matter jurisdiction. Plaintiff maintains that this action was improperly removed and continues to assert that vacatur of the removal is appropriate. Nothing herein shall be construed as acquiescence to federal jurisdiction but instead to demonstrate Plaintiff's willingness to participate in the judicial process in good faith.

### II. LEGAL STANDARD

1. L.R. 7-3 – Pre-Filing Conference of Counsel: Requires parties to meet and confer at least 7 days before filing certain motions, including motions to dismiss.

2. L.R. 11-3.1 – Format Requirements: Mandates use of consecutively numbered lines in pleadings.

3. L.R. 7-5(a) – Motions Must Include Points and Authorities: Requires a motion be accompanied by a memorandum of points and authorities.

4. L.R. 11-7 – Appendices and Attachments: Specifies how exhibits and appendices must be formatted and separated from the body of the brief.

5. L.R. 11-8 – Use of Headings and Subheadings: Requires properly structured and labeled headings to ensure clarity and compliance.

6. L.R. 11-6.1 & 11-6.2 – Word Count Certification: Requires accurate certification of word counts for memoranda, under penalty of sanctions.

7. L.R. 11-9 – Certification Statements: False certifications may be sanctionable under local rule authority.

8. Civ § 1793.03 – Mandatory Availability of Parts and Service: Requires manufacturers to make parts and repair information available for at least seven years after product manufacture.

9. Civ § 1761(d) – CLRA Definition of "Consumer": Defines a consumer as an individual acquiring goods/services for personal, family, or household purposes.

10. Civ § 1670.5(a) – Unconscionable Contracts – Judicial Power: Permits courts to refuse to enforce a contract (or any clause) found to be unconscionable at the time made.

11. Civ § 1670.5(b) – Evidence of Unconscionability: Entitles parties to present evidence on a contract's commercial setting, purpose, and effect when unconscionability is claimed.

12. CCP § 1770 – CLRA – Prohibited Acts: Lists unfair or deceptive acts in transactions intended for personal, family, or household use.

13. PC § 631(a) – Wiretapping and Eavesdropping: Prohibits unauthorized wiretapping or interception of communications.

14. PC § 502(c)(1) – Unauthorized Access: Prohibits knowingly accessing and using any data from a computer system without permission.

15. PC § 502(c)(1)(b) – Theft of Data or Intellectual Property: Targets unauthorized use or taking of data or programs.

16. PC § 502(c)(2) – Knowingly Accessing Data to Defraud or Obtain Value: Prohibits fraudulently accessing systems or data.

17. PC § 502(c)(7) – Introduction of Malware or Harmful Code: Outlaws transmission of code intended to disrupt or damage computers.

18. PC § 502(c)(13) – Altering, Deleting, or Destroying Data: Prohibits unauthorized tampering with digital files or information.

19. PC § 502(e)(1)(A) – Civil Remedies for Violations: Allows private individuals to bring civil actions for violations of § 502.

20. PC § 502(e)(1) – Private Right of Action: Grants standing to any person harmed by computer-related offenses under § 502.

21. 15 U.S.C. § 1125(a) – Lanham Act – False Advertising: Prohibits false or misleading advertising that harms consumers or competitors.

22. 17 U.S.C. § 102 – Copyright Protection: Protects original works of authorship fixed in a tangible medium.

23. 17 U.S.C. § 101 – Definition of Publication: Defines "publication" in the context of copyright timing and enforcement.

24. 17 U.S.C. § 412(2) – Prerequisite for Infringement Remedies: Requires timely registration of works to be eligible for statutory damages and attorneys' fees.

25. 17 U.S.C. § 1202(b)(1) – DMCA – Removal of Copyright Management Information (CMI): Prohibits the unauthorized removal or alteration of CMI when done to facilitate or conceal infringement.

26. 17 U.S.C. § 1203(c)(3)(B) – Statutory Damages for DMCA Violations: Provides enhanced damages for willful DMCA violations.

27. 18 U.S.C. § 1030 – Computer Fraud and Abuse Act (CFAA): Prohibits unauthorized access to protected computers and provides civil remedies.

28. New York Times v Microsoft Corporation – Copyright/intellectual property case

29. Electronic Communications Privacy Act (ECPA) – Privacy of Communications: Protects wire, oral, and electronic communications while in transit and when stored.

## III.    ARGUMENT

*1. **<u>Plaintiff Fails To Properly Plead His Tortious Interference Claim.</u>***

*2. " No contracts exist"*

c. ) Plaintiff objects that contracts do exist (Exhibits 180-182). Entertainment contracts and involvement are often accompanied by Non Disclosure

234    Agreements, which Plaintiff swore a duty to uphold and so, they are attached

235    in NDA-safe/redacted form. All parties which are involved with this game

236    have done so under signed agreements. The evidence of those Contracts is

237    clear from the involvement of notable parties: **Ron Wasserman** – Prestigious

238    6x ASCAP award winning  Hollywood composer with over 3,100

239    entertainment titles and famed work for the Power Rangers, X-Men and

240    DragonBall Z theme songs as well as award-winning work on SpongeBob

241    Squarepants; and work on Monty Python, Ace Ventura and more. (Exhibit

242    107, 115, 117) and;    **Aries Spears** – Comedian and actor, star of MadTV

243    from 1997 – 1995 known for his work also on Def Comedy Jam, All Star

244    Comedy Jam, Showtime at the Apollo, A Different World, Soul Train, jerry

245    Maguire, South of Sunset and his recurring stand-up at The Improv and The

246    Laugh Factory and**;    Alexis Mincolla** – Front-man of the Sony-signed neo-

247    industrial metal band 3teeth who not only licensed an entire album to

248    Plaintiff's game, but also his acting and appearance as the antagonist. (Exhibit

249    115, 117) also appearing on merchandise (Exhibit 122). Alexis and 3teeth are

250    also featured in Fortnite,  Guns Akimbo (Daniel Radcliffe), and others. and;

251    **Dino Cazares** – Rolling Stone's #81 greatest guitarist of all time. Founder of

252    the bands Fear Factory, Brujeria, Aesesino, Divine Heresy and others.

253    Licensed logo, music, acting and his appearance as an anatagonist in

254    Plaintiff's game. and;    **Kathleen Fisher** – Billboard Top 40 (#36) singer and

255    Trance Top 40 electronic music singer who has performed on tracks by

256    notable artists Armin Van Buuren, Aly & Fila, Sean Tyas, Paul Van Dyk,

George Acosta, The Thrillseekers, Filo & Peri,  Leon Bolier, Richard Durand,

Guiseppe Ottaviani -- she acts in Plaintiff's game as a protagonist. and;

**Alien Vampires** – Industrial/aggro duo which licensed 19 songs to Plaintiff's

game as well as acting and appearing as antagonists. and;   International

video game licensing contract with **Nintendo®** with release-ready SKU

(HAC-P-BCV4A) (Exhibit 28) and;   International video game licensing

contract with **Sony®** with release-ready SKU (CUSA34165_00) and;

**Additional contracts include** industrial/metal bands Grendel, Mass

Hypnosis, Aimee Saturne, Drallion and electronic artists Under This and

others. Further, numerous acting and performance contracts with performers

(Exhibit 108-110)

### 3.  *"Plaintiff does not allege Rokoko had any actual knowledge"*

d. )  Plaintiff has in fact alleged – as early as the Complaint -- that Defendant

knew. In fact, Defendant offered Plaintiff a discount on the equipment in

exchange for social media attention, and was tagged directly back (Exhibit

131) from a page hosting the professionally executed productions (Exhibit 106

– 131). Additionally, Defendant had refused relief for about 6 months before

receiving the early civil Complaint and did nothing to cure (Exhibit 191-193).

Additionally, Defendant had the early civil Complaint for 90 days,

participated in ODR and Arbitration and *still* did not cure.

### 4.  *"Plaintiff has failed to allege any intentional actions".*

a. ) **(First)** Plaintiff has shown a 270+ day long refusal to provide parts, repair or

replacement which is an intentional act to disrupt (Exhibit 184-186).

**(Second)** Defendant also made coercive claims directly to Plaintiff demanding that he drop the lawsuit and only *then* will they comply with Song-Beverly (Exhibit 166).        **(Third),** Plaintiff has demonstrated through Defendant's own technical logs that they:        **(Fourth)** released firmware which the developer notated *"Important: This breaks compatibility with older hub + glove FWs"* to purposely destroy older hardware (Exhibit 47) so that they may sell newer units to Plaintiff.        **(Fifth)** sold and continued trying to sell "wires" to Plaintiff when they always knew the problem was the firmware poisoned the hardware (Exhibit 175, 176), as their own software reported it to them (Exhibit 190) and in fact, these situations are not unique to Plaintiff but affected many customers (Exhibit 7-27). Further,

**5.  *"Plaintiff has not pled any facts demonstrating that the purported contracts were actually disrupted"***

   **a. )** Plaintiff doesn't need to plead the obvious; inference borrowed from shared logic is enough to satisfy: A music studio without microphones is a disrupted production, a movie set without cameras is a disrupted production, a video game without the ability to record movements for characters is a disrupted production.

6.  ***"or that he has suffered economic harm"***

   a. ) This is a factual issue of which the details are meant to be addressed during discovery and trial. For each day a production is delayed or disrupted, future economic benefit deteriorates. Direct economic harm is evident prima facie as and Plaintiff's sizable investment (financial, sweat and time) including but not

303  limited to the costs of Defendant's equipment; have been extinguished by

304  Defendant's actions. Additionally, Plaintiff had two pending books (Exhibit

305  125) and was in discussions with a renowned production studio regarding a

306  TV series (Exhibit 177) based on Plaintiff's 370 page screenplay (Exhibit

307  112) intended for Hulu, Shutter or Tubi (Exhibit 124), as well as numerous

308  contracts (Exhibit 180, 181), Spotify deals (Exhibit 182) and more.

7.  ***"Plaintiff's speculative and attenuated allegations that "[s]imilar game***
    ***productions . . . can expect $9M - $18M for moderate success, $30M in success"***
    ***are not sufficient."***

312  a. )  That statement mischaracterizes the basis of Plaintiff's valuation. Valuations

313  in industries ranging from real estate to cars, boats and more rely on

314  comparable market benchmarks – not guarantees – to establish reasonable

315  market expectations. Additionally, Plaintiff's game has been valued at

316  between $55M to $75M (Exhibit 183) by a Rockstar Games / 'Grand Theft

317  Auto' career expert game developer who remains personally thanked in the

318  credits and website of the aforementioned.

8.  ***"Either the economic relationship with a third party is too attenuated or the***
    ***probability of economic benefit too speculative."***

321  b. ) Plaintiff argues simply that there is nothing attenuated or speculative about

322  1:1 contracts (Exhibit 181, 182, 183) with multiple notable parties, and two

323  active licensing deals with Sony® and Nintendo® with release-level SKU's, a

324  nearly-complete AA quality open world video game (Exhibit 119-121), IGN

325  press coverage (Exhibit 106), a live Hollywood game event  (Exhibit 105),

326    two books, merchandising (Exhibit 122) and discussions about adaptation to

327    streaming TV (Exhibit 177). These are fixed commercial assets with imminent

328    commercial release.

329    **c. ) Causation of Failure:** Plaintiff's game requires animation, Defendant's

330    equipment provides that animation. Defendant broke Plaintiff's equipment

331    intentionally using poisoned firmware (Exhibit 47), always knew what the

332    issue was (Exhibit 190, 186) and continually tried to get Plaintiff to buy *wires*

333    multiple times (Exhibit 184, 185) knowing they'd not fix the issue and

334    directly lying to Plaintiff stating *"the logs indicate cabling issues"* when the

335    logs actually showed sensor errors (Exhibit 186). Defendant refused to fix the

336    required equipment in any capacity, halting the game from completing while

337    always being aware (Exhibit 185, 190).

338    **d. ) This claim must survive.**

339

340

341

342    **9.  _Plaintiff's Claim For Violations Of The Song-Beverly Act Fail As A Matter Of Law_**

343    **10. _"Consumer goods" within the meaning of the Song-Beverly Act is limited to "any_**

344    **_new product or part thereof that is used, bought, or leased for use for personal,_**

345    **_family, or household purposes."_**

346    **e. )** Plaintiff agrees with Defendant's definition of consumer goods. Plaintiff

347    purchased these goods using his own personal name, personal credit card, had

348    no company name, had no office address, and therefore had no place of

349    business. They were shipped to his home address (Compl Ex. 90-93) where he

350    used them (Exhibit 175) for personal purposes: to *learn* game development.

351    **11. "Plaintiff purchased the Rokoko products for commercial use, not personal use"**

352    f. )  This is demonstrably false. Plaintiff was not and is not a professional game

353    developer and has never profited from any game production whatsoever.

354    Game development is one of the most complex understandings in the field of

355    software learning takes time and iterative learning.

356    g. )  Defendant's suits were purchased as a logical next step to continue *learning*

357    game development on his own time as a hobbyist, while working two full time

358    jobs.

359    h. )  In fact, the game Plaintiff is now attempting to release (2025) is not the same

360    game he was developing at the time of purchase (2020). The current game is

361    titled The Next World (2025); the game in development when the suits were

362    purchased was titled The Nothing (2018), and prior to that, simply Nothing

363    (2016). These personal projects are materially and functionally distinct from

364    one another and in fact do not share even a single line of code nor were the

365    concepts remotely similar (Exhibit 176, Exhibit 177).

366    **12. "Plaintiff could state a cognizable claim for consumer goods under the Song-**

367    **Beverly Act—he cannot—such a claim is barred because he did not bring his claim**

368    **within one year after purchasing the products."**

369    i. )  Defendant's statement is entirely incorrect. Cal. Civ. Code § 1793.03 requires

370    that *"Every manufacturer making an express warranty with respect to an*

371    *electronic or appliance product"* – *"shall make available to service and*

372    *repair facilities sufficient service literature and <u>functional parts</u> to effect the*

373    *repair of a product <u>for at least seven years after the date a</u> **product model** **<u>or</u>***

374    ***type** was manufactured, <u>regardless</u> of whether the seven-year period exceeds*

375    *the warranty period for the product".* Plaintiff made numerous requests for

376    parts, but Defendant refused (Exhibit 186, 135, 136, 191-193) despite

377    Defendant advertising parts and service (Exhibit 62). Defendant directly lied

378    about the cause of the failure (Exhibit 184, 187) and demanded Plaintiff

379    purchase the latest model of equipment for nearly *six months*; even though

380    that new equipment contained the same parts as the unit Plaintiff owned

381    (Exhibit 26). This is not limited to Plaintiff, but other customers as well

382    (Exhibit 1-25)

383    **13. "claim for breach of implied warranty under Song-Beverly Act accrues upon**

384        **delivery"**

385        j. )  This is incorrect. California Court of Appeal has held that "*breach of implied*

386            *warranty may occur after delivery, or <u>when the latent defect manifests</u>" (see:*

387            *Mexia v. Rinker Boat Co., Inc., 174 Cal.App.4th 1297 (2009)).* Further,

388            Defendant intentionally shipped Plaintiff non-functional repair parts on or

389            about April of 2024 (waybill # 7604427213) and then delayed Plaintiff for

390            over a year (Exhibits 184-187). Defendant's defense is barred by the doctrine

391            of unclean hands as they **(First)** intentionally released mandatory firmware

392            updates (Exhibit 189) which destroyed Plaintiff's equipment (Exhibit 47) and

393            the equipment of many of their customers (Exhibit 1-25) as planned

394            obsolescence; and **(Second)** intentionally mislead Plaintiff about the true

395    cause of the issue while always knowing both from log files (Exhibit 94, 184,

396    187) and realtime diagnostics sent to them by their own equipment (Exhibit

397    198); and sold "wires" while knowing they would not resolve the "sensor"

398    problems they caused. (Exhibit 94)

399    **14. "Beverly claim relates to Rokoko's Services, Rokoko has expressly disclaimed any**

400    **warranties and the SongBeverly Act is therefore inapplicable"**

401    k. ) Defendant's counsel in that sentence admitted to disclaiming warranty; a

402    violation itself of Song-Beverly.

403    l. ) Defendant's own website *"All Rokoko Products Come with a default one Year*

404    *Warranty(period)"*. No other disqualifiers or modifiers are present. Further,

405    ALL manufacturers selling products in California lack the ability to disclaim

406    Song-Beverly consumer protections; especially when offering a 1-year

407    express warranty which is black-letter law under Cal. Civ. Code § 1793.03.

408    Defendant does offer such a warranty publicly: (Exhibit 61). Rokoko's

409    admission that it knowingly disclaims coverage while simultaneously offering

410    a one-year express warranty — in direct violation of California law — is not

411    only false advertising but a textbook trigger for Song-Beverly protections.

412    **m. )**   Further it is a direct violation of Song-Beverly to simply not provide parts

413    or repair services within the 7-year statutory period after the last manufacture

414    date of a model or type -- Cal. Civ. Code § 1793.03(b) which Defendant

415    refused for nearly a year.

**n. )** Plaintiff meets every statutory requirement of a consumer under the Song-
Beverly Act. Defendant's arguments are speculative, unsupported, and
premature.

**o. )  This claim must survive.**

### 15. _Plaintiff False Advertising Claim Fails As A Matter Of Law_

### 16. _"Plaintiff's use of Rokoko's Services are provided "as-is" and without warranty"_

**p. )** Defendant's Counsel is fundamentally misunderstanding the scope and the
technology. The software, services and hardware are all part and parcel. One
component. Defendant admits that the software is useless without the
hardware, the hardware is useless without the software and services (Exhibit
179). As found in Corley v. Stryker Corp. the court concluded that warranty
and product liability apply to the product as a whole; not only the physical
equipment, but also "software" which was "a necessary part" of the "product"
as a whole, and therefore was subject to strict liability as a _"component part
even though, physically, the software was entirely separate from the device."_.
Further, Under UCC § 2-316(1) a seller cannot disclaim an express warranty
once made; and Defendant does so post-sale in hidden terms.

### 17. _"such statements are not false or misleading, and therefore do not sufficiently
support a cause of action for false advertising."._

**q. )** Plaintiff disagrees, as does 15 U.S.C. § 1125(a). Selling a product with clear
and conspicuous messaging that says _"All Rokoko products come with a_

440    *default one year warranty"* and then in hidden contract terms, disclaiming any

441    warranties or fitness of a literal required component **after purchase** is false

442    advertising; By Defendant's absurd logic, Tesla should be able, under

443    California law, to advertise vehicles with an 8 year warranty, then in separate

444    post-purchase terms, disclaim warranty of the very core operating software,

445    "as-is", even though it is paramount for the operational existence their

446    vehicles. This invalidates required components warranty's by proxy. No

447    software, no Tesla. Akin to Defendant -- whose software, services and

448    hardware are inseparable and not interchangeable with any other software or

449    hardware beyond Defendants. Negation or limitation of warranty of any one

450    component affects all others by immediate proxy and doing so is inoperative

451    under UCC § 2-316(1).

452    **r. )** Further, Plaintiff's False Advertising claims extend beyond product warranty

453    claims but into the broader issues raised in the Complaint regarding materially

454    false statements of worldwide presence such as stating '250,000 creators

455    worldwise use us!' while in other posts '10,000 customers!' and

456    others '30,000 customers' as well as claims of offices in major cities with

457    teams in them; which are demonstrably false – **those offices do not exist**

458    (Exhibit 74, 69-73). Defendants "HQ" is a 400sqft locked basement with no

459    staff, equipment or manufacturing whatsoever (Exhibit 65-67). Claims of

460    100+ employees worldwide (Exhibit 74) which also was demonstrated to be

461    false.

**s. )** The difference between false statements and marketing puffery, easily falls to fraud when Defendant themselves rely on those statements to gain a valuation of $250M (Exhibit 197) while knowing they are false and others will rely on them. When challenged, Defendant expressly doubles-down and present them as true to Plaintiff in direct communications (Exhibit 143). It is not excusable to make materially false statements to induce reliance generally and furthermore, false statements such a s these presented to both consumer *and* investors when a fiduciary duty is owed to the latter is false advertising and fraudulent inducement to both resulting in measurable instantaneous and latent harm.

**t. )** Defendant knew their advertising was false and would hurt Plaintiff and consumers alike, so they attempted to contract out of liability (Compl ¶ 31*) "shall not be liable to you... for (i) any reliance placed by you on the completeness, accuracy, or existence of any advertising"*

**u. ) Plaintiff relied on those statements** -- If not for Defendant's false advertising and claims; and that Plaintiff would be entering into a relationship where his hardware would be intentionally disabled while his intellectual property would be taken and resold secretly by Defendant; he would never have purchased or used their equipment, software or services. No reasonable person would *pay thousands for that.*

**v. ) This claim must survive.**

485
486
487

488    *18. <u>**Plaintiff's Claims For UCL And CLRA Fail As A Matter Of Law**</u>*

489    *19. **Plaintiff Has Not Alleged That Rokoko Was Aware Of A Defect At The Time Of***

490    ***Sale***

491    **w. )**    This is a demonstrably false statement and is part of the Complaint and

492    evidence. Plaintiff notified Defendant of multiple defects immediately, within

493    days of purchasing the equipment as shown in the Complaint. Further,

494    Defendant Mikkel Overby shipped a replacement unit to Plaintiff (Exhibit 90-

495    93). Further, Defendant was notified that they gloves were falling apart upon

496    arrival and nonfunctional. Further, Defendant *was always aware* of defects.

497    Not only did Defendant purposely release poisoned firmware to break

498    Plaintiff's equipment (Exhibit47) his software secretly transmits diagnostics

499    live (Exhibit 190, 94) – yet Defendant refused to acknowledge that as the

500    cause of Plaintiff's equipment failures, instead, lying to have him purchase

501    parts ("wires" instead of "sensors") to intentionally never remedy the harm.

502    *20. **Plaintiff Is Not A "Consumer" Within The Meaning Of CLRA***

503    **a. )** *"To have standing, a plaintiff must be a "consumer" or "an individual who*

504    *seeks or acquires, by purchase or lease, any goods or services for personal,*

505    *family, or household purposes." See Balsam v. Trancos, Inc., 203 Cal. App.*

506    *4th 1083, 1088 (2012) (quoting Cal. Civ. Code § 1761(d)).* As demonstrated

507    in the 2nd Cause of Action for Song-Beverly Violations; Defendant is an

508    individual, who purchased goods from Defendant in 2020 for personal use

(learning game development) and of which was shipped to, and used in the household primarily. Plaintiff has still not used Defendant's hardware to profit even $1 commercially. Additionally, Defendant endlessly advertises their products intended for personal, household use: *"How to do Motion Capture at Home: A Simple Guide", "Smartsuit Pro, having Hollywood motion capture technology in your home", "The hardware you need to do motion capture at home", "Hardware for professional motion capture at home", "You can capture the animation you need at home using a simple setup.",* etc.

**21. Plaintiff admits that he purchased products from Rokoko for his professional use, not for "personal, family, or household purposes."**

   *a. )* This is simply incorrect. Plaintiff is not a professional and has never profited even a dollar from game development. He purchased the equipment in 2020 to learn game development, and for years after only used it within his home. Further, his wife is the only person who has operated Defendant's software while Plaintiff performs actions for recording within the suit (Exhibit 110). This is easily verifiable through public information and discovery processes which Defendant has avoided in State Court.

   b. ) Lastly, Defendant openly made coercive statements to Plaintiff stating they knew the hardware was destroyed and would not fix it unless the civil suit with all claims was dismissed (Exhibit 166) a strict violation of CLRA.

**22. "Plaintiff Failed To Comply With CLRA's Pre-Suit Notice Requirements"**

   a. ) Defendant was notified by personal service of their failures under the CLRA (Cal. Civ. 1750-1784, CCP 1770) on or about April 17, 2025 and given

express demands and opportunities to cure. Defendant not only failed to cure but actually increased the number of CLRA violations including not not limited to: misrepresenting Plaintiff's consumer rights, failing to honor warranties, inserting additional unconscionable contract terms, implementing further methods of false advertising.

### 23. *"Plaintiff's UCL Claim Is Derivative Of His CLRA and Song-Berverly Act Claims"*

a. ) Even if CLRA or Song-Berverly claims were dismissed (they shouldn't be), Plaintiff's UCL claim survives independently under the unfair and fraudulent prongs. Defendant's misconduct — including false advertising, intentional firmware lockouts and planned obsolescence, using tools to secretly exfiltrate Plaintiff's intellectual property, refusal to honor refunds, and secret use of out-of-state unlicensed attorneys , who under the contract of Defendant ghostwrote and authored filings bearing illegally placed signatures — constitute unfair competition regardless of statutory tethering.

b. ) Multiple independent bases support UCL liability: (first) Breach of warranty = "unlawful" prong. (second) Withholding defect disclosures = "fraudulent" prong. (third) Coercive refund evasion and post-sale sabotage = "unfair" prong. (fourth) Civil Code violations and even ethical breaches by legal counsel may qualify. UCL is intentionally broad. *["[A]n 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."]; State Farm Fire & Casualty Co. v. Superior Court, supra, 45 Cal.App.4th at p. 1104 [" 'the court must weigh the utility of the*

555          *defendant's conduct against the gravity of the harm to the alleged victim' "].)*

556          *[20 Cal. 4th 185]*

557       **c. ) This claim must survive.**

558

559

560    24. <u>**"Plaintiff's Claim For "Misappropriation Of Intellectual Property" Fails As A**</u>

561        <u>**Matter Of Law"**</u>

562    25. **"Plaintiff Has Not Identified Any Purported Trade Secret With The Requisite**

563        **Specificity."**

564       *a. )* This is demonstrably false. Plaintiff did not plead the obvious in his

565          Complaint that: 'Video games are movies which the entire universe must be

566          reinvented for it in vast depth'. Just as in movies, the scripts, scenes, plots,

567          story are all trade secrets meant to be disclosed when release is imminent or

568          passed; never before. As found in *Defiance Button Mach. Co. v. C & C Metal*

569          *Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985):*"In order to successfully*

570          *state a claim for trade secret misappropriation, courts require that the*

571          *[plaintiff-]possessor of a trade secret take reasonable measures to protect its*

572          *secrecy."*. The story, acting, music, other content and cinematic scenes in

573          Plaintiff's video game are protected by strict NDA and protected by Copyright

574          under 17 U.S.C. Section 102 and further registered with the Writers Guild of

575          America (WGA Reg # 2288210) and the U.S. Copyright Office

576          (#14,954,598,732). Notwithstanding that Plaintiff brought this as a state

577      matter (where copyright office registration is not required) and Defendant

578      removed to Federal to purposely attempt to subvert Plainitff's copyright.

579          b. ) Plaintiff's intellectual property qualifies as a trade secret at a minimum and is

580      afforded further protections as 17 U.S.C. § 412(2) *"Registration as a*

581      *prerequisite to certain remedies for infringement"… "The work was*

582      *registered within 3 months of first publication".* First publication expressly

583      defined under 17 U.S.C. § 101 as "*the distribution of copies or phonorecords*

584      *of a work to the public by sale or other transfer of ownership, or by rental,*

585      *lease, or lending."*. As Plaintiff's game has not been transferred or sold

586      whatsoever to the public, it's "first publication" date has not even occurred yet

587      and so is not time barred for registration.

588      **26. "Plaintiff Has Failed To Plead A Misappropriation"**

589          a. ) Plaintiff literally shared digital forensics in both image (Exhibit 29-60) and

590      video (Exhibit 171-174) which clearly show Defendant misappropriating

591      Plaintiff's intellectual property in real-time. Further, Defendant admits to

592      taking Plaintiff's intellectual property, stripping (or "Anonymizing") it's

593      authorship data to sell to third parties – one of which is an Alter Ego of

594      Defendant ("Rokoko Care" aka "Coco"). Lastly, as shown in Plaintiff's MSJ;

595      Defendant has added a counter to their website www.rokoko.com which

596      admits collection, aggregation, storage and counting of users intellectual

597      property: *"1,156,410 Human motion assets created By our global community*

598      *of Rokoko motion capture tools users - Count refreshes daily".* (Exhibit 178)

599      Defendant since 2022 has sought investor money and admitted in it's pitch

deck (Exhibit 76-86) that it planned to misappropriate Plaintiff's intellectual property to sell to third parties and use in their "Parallel Company" (Rokoko Care) which is a separate investment vehicle alter-ego of Defendant registered to the same abandoned basement office "HQ". Plaintiff claims to now be worth $250M (Exhibit 197) through investors who have since joined due to this pitch deck.

### 27. *"Plaintiff's Intellectual Property Infringement Claim Fails As A Matter Of Law"*

a. ) *New York Times Company v. Microsoft Corporation* found Defendants precise actions (misappropriation of IP to train an AI model) are concrete to satisfy the injury-in-fact requirement for Article III standing.

b. ) Plaintiff has met every prong for intellectual property infringement, and Defendant has made countless express admissions in their pitch deck (Exhibit 76-86), their revenue and Company worth based upon it, interviews with Defendant which claim they do so, and their investors who admit the same (Exhibit 154,155).  Further, Defendant procured a $93,000,000.00 equity stake investment from the worlds leading metaverse company who is a recipient of the misappropriated intellectual property; in addition to many more investments for the same.

c. ) Lastly, Defendant's own equity shareholders, and themselves (as their parralel company "Rokoko Care"); have made express statements that they were the recipients and benefactors of Plaintiff's misappropriated IP. They have bragged openly in blogs, interviews, press releases and advertisements. (Exhibit 154,155)

623         **d. ) This claim must survive.**

624

625

626

627

628

629        ***28. "Plaintiff Fails To State A Claim Under the Digital Millenium Copyright Act"***

630        ***29. "Plaintiff Lacks Standing Due To Failure To Allege A Cognizable Injury"***

631           a. )  The theft of ones confidentially held, unreleased intellectual property --

632              especially when that damaging Party monetizes the work of another for profit

633              without authorization *is a cognizable injury prima facie* notwithstanding that

634              he has expert valuations of his intellectual property performed; and so real

635              value is established and significant. This is further reaffirmed in New York

636              Times Company v Microsoft Corporation.

637        ***30. "Plaintiff Fails To State A Claim Under § 1202(b)(1)"***

638           b. ) New York Times Company v Microsoft Corporation disagrees as does

639              Plaintiff.

640           c. ) Plaintiff is the sole owner of the intellectual property in question. These works

641              contain(ed) Copyright Management Information ("CMI") in the form of file

642              and embedded metadata which includes the author name, project title, title of

643              the creative work, creation date, additional actor(s) by name which are

644              included in the scene as well as specific device serial numbers and unique

645              identifiers (Exhibit 141, 142). Further, Defendant pairs that data with

646              biometrics identifying Plaintiff specifically (Exhibit 55) and additionally

647    receives such CMI information separately for cataloging in their remote

648    databases (Exhibit 56)

649  d. ) § 1202(b)(1) says: "*No person shall, without the authority of the copyright*

650    *owner or the law— (1) intentionally remove or alter any copyright*

651    *management information, (2) knowing, or having reasonable grounds to*

652    *know, that it will induce, enable, facilitate, or conceal an infringement…"*.

653    Wherefore, Plaintiff at the time of Complaint literally provided live, video

654    evidence showing that: **(first)** CMI ("authoring metadata") exists in the files

655    and **(second)** Defendant removes that CMI and that **(third)** Defendant's terms

656    and conditions as of March 29, 2025 state they *will* strip CMI from the works

657    to "anonymize" it (Compl. ¶ before resale to third parties and **(fourth)**

658    Defendant openly admits to that intention in investor decks since at least 2022

659    (Exhibit 76-86) and **(fifth)** Defendant openly admits to doing so in magazine

660    interviews *(see Motion to Strike Defendants Removal Declaration SET1)* and

661    **(sixth)** Defendant added a counter to his own website to display the amount of

662    intellectual property collected in real-time and **(seventh)** Live video (Exhibit

663    171-174) and photographic evidence (Exhibit 35-39, 50, 52, 53) demonstrate

664    absolutely that Plainitff's intellectual property was taken by Defendant.

665  e. ) Stevens v. CoreLogic, Inc., 899 F.3d 666, 673 (9th Cir. 2018) states *"DMCA*

666    *liability attaches if metadata was removed with the knowledge that it would*

667    *conceal infringement."* Of which Defendant literally states in their T&C's

668    *"All user content is to be fully **anonymized** and never distributed in it's*

669    *original form from any subcontractor or third-party licensor"*. A party

removing an authors name from a book to profit from the work within it, does
not obliterate that authors ownership over the works within, it gives claim to
misappropriation and –if used- infringement as causes of action. The same
simple logic applies here.

f. ) As black-letter law, Defendant's intent and actions are precisely what 17
U.S.C. Title 102 and 1202(b) were enacted to prevent -- the protection of
ownership and attribution in creative works, and the prohibition on removing
that attribution to enable infringement..

g. ) Stevens v. CoreLogic and the DMCA sets forth protections against knowing
removal or alteration of CMI when done with intent to induce, enable,
facilitate, or conceal infringement. Under Stevens v. CoreLogic, Plaintiff does
not need to prove actual infringement, just that Defendant removed or altered
CMI with intent to allow or conceal it; and further as Defendant has openly
admitted to it's intents to do so (Compl ¶ 72, 74), as well as openly admitting
to actually doing so; Plaintiff is justified in bringing action and further
violations under U.S.C. § 1203(c)(3)(B).

h. ) As found in New York Times Company v Microsoft Corporation: *"Dismissal
of a copyright infringement claim on statute of limitations grounds at the
pleadings stage is only appropriate when it is clear from the face of the
complaint" -- "that the plaintiff's claims are barred as a matter of law". 17
U.S.C.A. §§ 501, 507(b); Fed. R. Civ. P. 12(b)(6)."*

i. ) **This claim must survive.**

693

694

695

696

697

### 31. *"Plaintiff's "Unconscionable Contract Terms" Claim Fails As A Matter Of Law"*

j. ) Unconscionability is fact-driven and requires an intensely factual inquiry, not
suitable for dismissal under Rule 12(b).

k. ) *"A contract of adhesion containing oppressive and surprise terms in a
consumer context may be deemed unconscionable."* This principle was
highlighted in the case of Szetela v. Discover Bank, 97 Cal. App. 4th 1094,
1100 (2002). Plaintiff and Defendant's Counsel's own admissions - have
demonstrated that Defendant owns multiple-sets of "terms and conditions"
most of which are overriding in nature and hidden from consumers until at
least post-purchase (Exhibit 173). Further, Plaintiff has demonstrated that
Defendant has altered his terms and conditions 67+ times in 5 years with only
one notice (Exhibit 194) and that those terms which changed drastically in late
march set to retroactively grant Plaintiff unilateral rights over Plaintiff's
intellectual property while simultaneously chilling access to the Courts;
disclaiming warranty's and more; all of which was non-present one day prior
(Exhibit 195, 196, 172).

l. ) Defendant does not raise unconscionability as a monetary claim, but instead
for the Court to make a decision on whether the terms are unconscionable or
not. As Plaintiff has raised UCL and CLRA claims, *Perdue v. Crocker*

*National Bank* and Civil Code § 1670.5 codified the equitable doctrine of unconscionability into statutory law, and therefore it can be raised as a claim of which the remedy, absent the inherent power of the Court, is refusal to enforce or recognize any such terms of the agreement, or the agreement as a whole as invalid.

m. )    The Court has continually upheld that Defendant's contractual terms and the matter in which they are made available are unlawful and further: Civ. Code, § 1670.5(a) reinforces *"If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract"* and additionally, Civ. Code, § 1670.5(b) enables Plaintiff to bring such a matter to the Court for determination: *"When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."*

**n. ) This claim must survive.**

32. ***"Plaintiff's Claim For "Illegal Deployment Of Code & Privacy Violations" Fails As A Matter Of Law."***

o. ) This claim is fact-driven and requires an intensely factual inquiry, not suitable for dismissal under Rule 12(b).

p. ) Further, the Defendant is incorrect. California Invasion of Privacy Act (CIPA) is the controlling authority on this exact issue and not only is it a matter of civil law it is a matter of criminal law under Cal. Penal Code § 631(a), and particularly CA Penal Code§ 502; (specifically applicable under (c)(1), (c)(1)(b), (c)(2), (c)(7), (c)(13)).

q. ) Defendant has made multiple express admissions and Plaintiff has video evidence (Exhibit 171-174) and investor pitch decks (Exhibit 76-86) which provably show intent to execute their long-planned scheme to defraud. Defendant meets the criteria under CA Penal Code § 502(e)(1)(A) [*"devise or execute any scheme or artifice to defraud, deceive, or extort"]* and while a criminal statute, CA Penal Code § 502(e)(1) makes civil action possible against Defendant as it states: *"Any person who suffers damage or loss by reason of a violation... may bring a civil action against the violator.".*

r. ) Plaintiff has demonstrated that he is a victim of intellectual property theft and additionally, that Defendant deprived him of locally available source files (Exhibit 173, 173) by way of deletion once the theft has occurred, a strict violation of CA Penal Code §502(c)(1) and as a method to induce reliance on Defendant and their services to perpetuate a cycle of harvesting intellectual property from Plaintiff;

s. ) Defendant's software secretly sends personal information including biometric data, a catalog of hardware and software installed on Plaintiff's machine (Exhibit 58), detailed device diagnostics (Exhibit 59), even Plaintiff's wifi SSID and info (Exhibit 60) and user telemetry when anything is accessed or

763    clicked (Exhibit 31). This is textbook digital overreach and Plaintiff reserves

764    the right to raise this as a possible IIPE (Intrusion Into Private Economic

765    Affairs) claim.

766    t. )  Defendant has also demonstrated that on desktop-based software (which does

767    not use web-based code unless designed to) receives remotely deployed

768    JavaScript from unsecure AWS servers that Defendant owns for local

769    execution on Plaintiff's machine (Exhibit 49)

770    u. )  Additionally Defendant ignores the Computer Fraud and Abuse Act (18

771    U.S.C. § 1030) and Electronic Communications Privacy Act (ECPA): Both

772    statutes support claims when a party accesses a protected computer without

773    authorization or exceeds authorized access.

774    **v. )  This claim must survive.**

775

776

777

778    *33. <u>"Plaintiff's Fraud-Based Claims Fail As A Matter Of Law"</u>*

779    *34. "Plaintiff Has Not Sufficiently Pled Claims For Fraud In The Inducement,*

780    *Fraudulent Misrepresentation Or Fraudulent Concealment."*

781    a. )  FRCP 9(b) requires specificity — the Complaint provides it entirely from day

782    1.  **(Who)** Jakob Balslev, Mikkel Overby, Rokoko, Investors, Recipients,

783    Parallel Companies, etc.    **(What)** Made specific false representations about

784    system reliability, firmware integrity, warranty terms, availability of parts and

785    repair services, promised future support, false statements of staff count, office

786    locations, company capabilities, etc.    **(When)** On or about 2020-2025.

**(Where)** Plaintiff and Defendant's communications, advertising materials, pitch decks, terms and conditions, websites, videos, social media, other forms of evidence, etc.    **(How)** Rokoko made affirmative misrepresentations and omitted material facts while knowing the system had released poisoned firmware, and receiving live diagnostics to the actual issue with Plaintiff's equipment and further, misleading Plaintiff on the cause and remedy while simultaneously pilfering his intellectual property and misleading other customers and investors alike.    **(Why)** to destroy Plaintiff and consumers' older hardware forcing them to buy new and produce higher-quality animations that Defendant could secretly misappropriate for the purpose of building their $250M (Exhibit 197) IP-funnel enterprise entirely designed to misappropriate mass amounts of IP from unsuspecting creators. Whose admitted intent is to resell to third-parties while seeking investor money for multiple vehicles which use the same IP; backed by Defendant's own statements, investor decks and terms and conditions.

**b. )** Plaintiff has sufficiently pled all elements of fraud, including inducement, misrepresentation, and concealment, with the specificity required by Rule 9(b). Defendant made multiple false statements before and during the transaction, concealed material facts within its exclusive knowledge, and engaged in a pattern of deceptive behavior intended to induce Plaintiff's reliance. These facts are pled with particularity, supported by documentation, and result in clear economic harm. Dismissal under Rule 12(b)(6) is improper.

### 35. *"Plaintiff's Fraud Claims Are Also Barred By The Economic Loss Doctrine"*

c. ) The economic loss doctrine does not bar fraud-based torts where fraud is independent of the contract. Plaintiff provides thirteen causes of action, nearly all of them involving blatantly evidenced fraud committed (and expressly admitted) by Defendant. California courts have repeatedly held that the economic loss rule does not apply where: *"(a) The defendant engaged in fraudulent inducement into the contract, or (b) There is intentional misrepresentation, concealment, or deceit that exists independently of the breach."*

**d. )** Robinson Helicopter Co. v. Dana Corp  found "*[I]n each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." (Id. at p. 552, 87 Cal.Rptr.2d 886, 981 P.2d 978;  see also Harris v. Atlantic Richfield Co. (1993) 14 Cal.App.4th 70, 78, 17 Cal.Rptr.2d 649 ["when one party commits a fraud during the contract formation or performance, the injured party may recover in contract and tort"].)*

e. ) **Plaintiff's Fraud Claim's must survive.**

## **CONCLUSION**

All of Plaintiff's claims survive as a matter of law. Due to the overwhelming evidence and fact-specific questions against Defendant and their actions, dismissal at this stage for any cause of action is entirely inappropriate for a Rule 12(b) as specifically stated in 12(b)(6): *"The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the district court on a motion to dismiss for failure to state a claim; fact-specific*

833 *questions cannot be resolved on the pleadings.".* Further, as jurisdiction has not been

834 established, this Court lacks standing to decide on the merits until jurisdiction has been

835 established per Rule 12(b)(1).

836

837 Plaintiff hereby requests that Defendant's improper and highly defective **motion to dismiss** be

838 stricken from the record.

839

840 Executed this 14 day of July, 2025 in Santa Clarita, California.

841

842

843 Matthew R. Walsh

844 matthew@winteryear.com

845 19197 Golden Valley Rd #333

846 Santa Clarita, CA 91387

847 (661) 644-0012

848 matthew@winteryear.com

849 Plaintiff in pro per

850

851
852

## **<u>CERTIFICATE OF COMPLIANCE</u>**

853  The undersigned, counsel of record for Plaintiff appearing in pro per, certifies that this brief

854  contains 6,924 words, which complies with the word limit of L.R. 11-6.2. The memorandum of

855  points and includes a table of contents in compliance with L.R. 11-8.

856

857                                                                           DATED: July 13, 2025

858                                   _____

859                                                                           Matthew R. Walsh

860                                                                           Plaintiff in pro per

861

PAGE 37