MATTHEW R. WALSH
19197 GOLDEN VALLEY RD #333
SANTA CLARITA, CA 91387
(661) 644-0012

Plaintiff In Pro Per,

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW R. WALSH<br>19197 GOLDEN VALLEY RD #333<br>SANTA CLARITA, CA 91387,<br><br>      Plaintiff In Pro Per,<br><br>vs.<br><br>ROKOKO ELECTRONICS<br>(AND DOES 1 THROUGH 50,<br>INCLUSIVE)<br>31416 AGOURA RD STE 118<br>WESTLAKE VILLAGE, CA<br>91361<br><br>      Defendant | Case No.: 2:25-CV-05340-ODW-RAO<br><br>Before: Hon. Otis D. Wright II<br>Courtroom 5D<br><br>Hearing date: October 20, 2025<br>Hearing time: 1:30PM<br><br>**REQUEST FOR JUDICIAL NOTICE RE: DEFENDANT'S RELIANCE ON FABRICATED CASELAW** |

## <u>REQUEST FOR JUDICIAL NOTICE RE: DEFENDANT'S</u>

## <u>RELIANCE ON FABRICATED CASELAW</u>

Pursuant to Federal Rule of Evidence 201(b), Plaintiff respectfully requests that the Court take judicial notice of the following facts, each of which is either (1)

PAGE 1

not subject to reasonable dispute because it is generally known within this Court's jurisdiction, or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Plaintiff specifically requests judicial notice of the following:

1. **EXHIBIT 1 –** ChatGPT was questioned if it invented Defendant's caselaw, it says yes and then explains how to tell – and what the process was.

2. **EXHIBIT 2 through 12 –** WestLaw demonstrating the caselaw Defendant used, quoted and threatened Plaintiff with does not exist; suggesting it may possibly have been generated by ChatGPT or another AI.

3. **EXHIBIT 13 –** Defense Counsel's e-mails cite case law which does not mention the quotes or phrases they claim.

4. **EXHIBIT 14 –** Westlaw & CM/ECF screenshots to support Exhibit 13

5. **EXHIBIT 15 -** Johnson v Dunn (Case No.: 2:21-cv-1701-AMM) reprimand order disqualifying Counsel, bar referral, monetary sanctions and more for using AI-fabricated caselaw.

Plaintiff also asks the Court to take judicial notice of the following:

6. **United States of America v. Sigma International, Inc 300 F.3d 1278 (11th Cir. 2002)**'s opinion on using caselaw from vacated cases: *"Both*

*opinions remain vacated, and are officially gone. They have no legal effect whatever. They are void. None of the statements made in either of them has any remaining force and cannot be considered to express the view of this Court."*

7. **Federal Rule of Civil Procedure 41** dictates the effect of a case dismissal. Many dismissals, particularly voluntary ones, do not constitute a decision on the facts or merits of the case. In such instances, there is no binding precedent to cite.

8. *The Stare Decisis Doctrine* A dismissed case lacks a final ruling on the issues, so there is no legal principle for a court to follow.

All exhibits attached hereto are true and accurate copies of documents I have received or made. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 29, 2025, in Santa Clarita, California.

Matthew R. Walsh

Plaintiff in pro per

PAGE 3

# EXHIBIT 1

Plaintiff independently verified that the case citations contained in Defendant's correspondence do not exist in any public or subscription legal database (Westlaw, LexisNexis, or Fastcase). Plaintiff further consulted the most used AI tool to cross-check the citations *after Westlaw confirmations*, which likewise returned no matches. This verification is submitted solely to establish the potential source of and additionally the *absence* of the cited authorities as well as *how to tell* the caselaw was AI generated. The verification is not submitted to rely on the tool's opinions as testimony or evidence.



ChatGPT 5 ⌄                                                              ⬆ Share  ⋯

🚩 3. "*New Prime, Inc. v. Prime Grp. Holdings LLC*, 2024 U.S. Dist. LEXIS 58322 (C.D. Cal. Mar. 28, 2024)"

- **No record** of such dispute or citation.
- "New Prime Inc." litigation occurs in the E.D. Ark. and D. Mass., never the C.D. Cal.
- This is **invented**.

🚩 4. "*Sky Fin. & Intel., LLC v. Cliq, Inc.*, 2024 U.S. Dist. LEXIS 185989 (C.D. Cal. Sept. 24, 2024)"

- **No traceable docket**; the "Intel." abbreviation is nonsensical ("Intelligence"?).
- Likely fabricated.

🚩 5. "*Pearson v. Cincinnati Ins. Co.*, 2025 U.S. Dist. LEXIS 92488 (C.D. Cal. Apr. 14, 2025)"

- Again **no existing case**, and an April 2025 LEXIS citation would not yet exist publicly.
- Fabricated.

⚠️ 6. Partial Real Case Used Out of Context

- *Moon v. SCP Pool Corp.*, 232 F.R.D. 633 (C.D. Cal. 2005) — **real**, but here quoted for a rule it never established (it addressed burden, not overbreadth language).
- *Williams v. City of Dallas*, 178 F.R.D. 103 (N.D. Tex. 1998) — **real**, but the specific pinpoint cite "110" is mis-used; that case dealt with discovery proportionality, not subpoena facial invalidity.

These are **common in LLM outputs** trained on generic discovery briefs.

⬇

🔴 Conclusion

At least **five of the nine case citations** in this Reed Smith letter are **nonexistent**—strongly indicating **AI generation or careless use of an AI draft** without verification.
The remaining two are **misapplied**, suggesting **automated drafting** rather than manual legal research.

If you want, I can generate a short **RJN table** listing each fake citation, verification source, and note ("No docket / Invented") so you can attach it as Exhibit A to your response. Want me to draft that?

⎘  👍  👎  ⬆  ⟳  ⋯

Is this conversation helpful so far?  👍  👎  ✕

PAGE 7

# EXHIBIT 2

Defendant cites *Villanueva v. County of Los Angeles*, 2025 U.S. Dist. LEXIS 116120, at *4 (C.D. Cal. Apr. 14, 2025), for the proposition that "Federal courts ordinarily recognize a constitutionally based right of privacy that can be raised in response to discovery requests." This citation is misleading. The quoted language does not appear anywhere in the decision, and the case itself carries no authority: **it was dismissed by the Court on September 2024, and dismissed again on May 15, 2025**, in Case No. 2:24-cv-04979



# EXHIBIT 3

Defendant cites *SPS Techs., LLC v. Briles Aero., Inc.*, 2019 U.S. Dist. LEXIS 241074 (C.D. Cal. June 24, 2019), asserting that "Courts have routinely quashed subpoenas seeking confidential commercial information such as this." However, the word "subpoena" does not appear anywhere in that decision. In fact, the case concerned a dispute over confidentiality designations under a protective order, stating: *"Defendants contend that Plaintiff has improperly designated two documents as 'Highly Confidential—Attorney's Eyes Only' under the Amended Protective Order. (Joint Stip. at 2)."* Further, that case is not an authority - it was vacated.



PAGE 11

The case was largely dismissed and later vacated. Nevertheless, Defendant's citation treated it as binding precedent, and Defendant relied on that fabricated authority to support their demands and arguments.





UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

CIVIL MINUTES—GENERAL

Case No.  **CV 18-9536-MWF (ASx)**          Date:  **November 15, 2021**
Title:        SPS Technologies, LLC v. Briles Aerospace, Inc.

Present:    The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

Deputy Clerk:                              Court Reporter:
Rita Sanchez                               Not Reported

Attorneys Present for Plaintiff:           Attorneys Present for Defendant:
None Present                               None Present

Proceedings (In Chambers):    ORDER GRANTING MOTION FOR
                              VOLUNTARY DISMISSAL PURSUANT TO
                              FRCP 41(A)(2) [1018]

Before the Court is Plaintiff SPS Technologies, LLC's ("SPS") Motion for Voluntary Dismissal Pursuant to FRCP 41(a)(2) (the "Dismissal Motion"), filed on September 10, 2021. (Docket No. 1018). Space-Lok, Inc. ("Space-Lok") filed its opposition (the "Opposition") on September 15, 2021. (Docket No. 1028). SPS filed a reply (the "Reply") on September 20, 2021. (Docket No. 1036).

The Court has read and considered the papers filed in connection with the Motion and held a telephonic hearing on **October 13, 2021**, pursuant to General Order 21-08 arising from the COVID-19 pandemic.

For the reasons that follow, the Dismissal Motion is **GRANTED** *with prejudice*. Voluntary dismissal under Rule 41(a)(2) is warranted because it would not legally prejudice Space-Lok. Space-Lok may seek recovery of those fees spent on the Rule 16 process that do not include the motions in limine. These narrowly defined fees are for the time spent that would not be useful in a future litigation on the merits. The parties are **ORDERED** to meet and confer on the amount of those fees and costs. If the parties cannot agree, then Space-Lok shall file a motion for fees and costs as set forth in the Local Rules.

**I.    BACKGROUND**

# EXHIBIT 4

Defendant relies on the caselaw: *"[t]he clerk must issue a subpoena, signed but otherwise in blank, to a party who requests it. That party must complete it before service. An attorney also may issue and sign a subpoena if the attorney is authorized to practice in the issuing court."* See also Ekene v. Office L. Fowler, 2023 U.S. Dist. LEXIS 187409, at *3 (C.D. Cal. April 13, 2023). Not only does that quote not exist, the word "sign" does not appear whatsoever. Further, the case was voluntarily dismissed and never produced a substantive ruling.



The case was voluntarily dismissed. Nevertheless, Defendant's citation treated it as binding precedent, and Defendant relied on that fabricated authority to support their demands and arguments.



# EXHIBIT 5

Defendant relies on the caselaw: ("Plaintiff, proceeding pro se, may only serve a subpoena issued by the Clerk of this Court."); McGee v. Cnty. of Riverside, 2022 U.S. Dist. LEXIS 193707, at *2 (C.D. Cal. Oct. 21, 2022) ("If a pro se plaintiff needs to seek information from non-parties, this must be done through a subpoena issued by the Clerk and approved by the Court."). The term subpoena does not appear anywhere in the case which is actually about amending Plaintiff's complaint.



The case was voluntarily dismissed. Nevertheless, Defendant's citation treated it as binding precedent, and Defendant relied on that fabricated authority to support their demands and arguments.



# EXHIBIT 6

Defendant relies on the caselaw: Villanueva v. Cnty. of Los Angeles, 2025 U.S. Dist. LEXIS 116120, at *4 (C.D. Cal. April 14, 2025) ("Federal courts ordinarily recognize a constitutionally based right of privacy that can be raised in response to discovery requests."). This case was dismissed in September 2024 and again on or about May 15, 2025.



# EXHIBIT 7

Defendant relies on the caselaw: When a subpoena is directed to a non-party, the standards for discovery "require a stronger showing of relevance than for simple party discovery." Monster Energy Co. v. Vital Pharm., Inc., 2020 U.S. Dist. LEXIS 87320, at *16 (C.D. Cal. March 10, 2020). Not only does that quote not exist, the word "relevance" does not exist within the ruling either.



The case was voluntarily dismissed. Nevertheless, Defendant's citation treated it as binding precedent, and Defendant relied on that fabricated authority to support their demands and arguments.



# **EXHIBIT 8**

Defendant relied on the case law (finding "[documents] which regard or reference" facially overbroad); Stewart v. Mitchell Transport, U.S. Dist. LEXIS 12958 (D. Kan. July 11, 2002) (finding "[documents] regarding" facially overbroad); However, the words regard and overboard does not even appear in the case.



The case was voluntarily dismissed. Nevertheless, Defendant's citation treated it as binding precedent, and Defendant relied on that fabricated authority to support their demands and arguments.



# EXHIBIT 9

Defendant relied on the caselaw:  Bradley v. Val-Mejias, 2001 U.S. Dist. LEXIS 25278, at *18 (D. Kan. Oct. 9, 2001) ("use of the term `pertaining to,' often makes a discovery request overly broad and unduly burdensome on its face"). Not only does the quote not exist, but the word pertaining does not appear either.



Bradley v. Val-Mejias went up on appeal, was affirmed, mandate issued, and case closed in 2004. There's no indication the decision Defendant quoted from that supposed "pertaining to" language ever existed in the district opinion or the appellate ruling.

ɔv/n/beam/servlet/TransportRoom?servlet=CaseSummary.jsp?caseNum=02-3421&dktType=dktPublic&incOrigDkt=Y&incDktEntri...  ☆

**CM ECF**    <u>Case Search</u>   <u>Calendar</u>   <u>Opinions</u>   <u>Orders/Judgments</u>   <u>Briefs</u>   <u>XML</u>   <u>TXT</u>                    <u>Logout</u>  <u>Help</u>

If you view the  Full Docket  you will be charged for 2 Pages $0.20

**General Docket**
**Tenth Circuit Court of Appeals**

| | |
|---|---|
| **Court of Appeals Docket #:** 02-3421 | **Docketed:** 12/03/2002 |
| **Nature of Suit:** 4362 Medical Malpractice | **Termed:** 07/23/2004 |
| Bradley v. Val-Mejias, et al | |
| **Appeal From:** United States District Court for the District of Kansas - Kansas City | |
| **Fee Status:** Fee Paid | |

**Case Type Information:**
  1) civil
  2) private
  3) -

**Originating Court Information:**
  **District:** 1083-2 : <u>00-CV-2395-GTV</u>
  **Court Reporter:** Nancy Wiss, -
  **Sentencing Judge:** G. Thomas Van Bebber, -, Senior U.S. District Judge
  **Date Filed:** 09/01/2000
  **Date NOA Filed:**
  11/26/2002

| | | |
|---|---|---|
| 08/08/2003 | 26 | [1634007] Hearing set for November 2003 Session, at Denver, Colorado. [Entered: 08/08/2003 07:45 AM] |
| 10/06/2003 | 27 | [1652650] Appellant's motion to substitute attorney for oral argument. Appellant requests Timothy Buxton appear and argue at oral argument in substituion for Anthony Viorst, filed by Rick Bradley and submitted to court. [Entered: 10/07/2003 03:08 PM] |
| 10/10/2003 | 28 | [1654085] Notice of appearance filed by Timothy Gill Buxton as attorney for Rick L. Bradley. CERT. OF INTERESTED PARTIES (y/n): n. [Entered: 10/14/2003 01:25 PM] |
| 10/15/2003 | 29 | [1654690] Order filed by PF - granting the motion of appellant to allow Timothy Buxton to present oral argument on November 18, 2003 instead of Anthony Viorst. Parties served by mail. [Entered: 10/15/2003 03:44 PM] |
| 10/22/2003 | 30 | [1656524] Notice of appearance filed by Scott S. Watson as attorney for Rick L. Bradley. CERT. OF INTERESTED PARTIES (y/n): n. [Entered: 10/22/2003 04:18 PM] |
| 11/18/2003 | 31 | [1663032] Case argued by Timothy G. Buxton for appellant and Stephen M. Kerwick, for appellee; Submitted to Judges Murphy, Holloway, McConnell. [Entered: 11/18/2003 01:59 PM] |
| 07/23/2004 | 33 | [1726487] Terminated on the Merits after Oral Hearing; Affirmed; Written, Signed, Published. Murphy; Holloway, authoring judge; McConnell. Parties served by mail on 7/23/04. [Entered: 07/23/2004 10:11 AM] |
| 08/16/2004 | 35 | [1732370] Mandate issued. Mandate receipt due 9/15/04. [Entered: 08/16/2004 07:56 AM] |
| 08/26/2004 | 36 | [1735456] Mandate receipt filed. [Entered: 08/26/2004 10:31 AM] |
| 10/18/2004 | 37 | [1749140] Case file closed. Shipment to records center due 10/18/06 [Entered: 10/18/2004 01:24 PM] |

**PACER Service Center**

The case was dismissed. Nevertheless, Defendant's citation treated it as binding precedent, and Defendant relied on that fabricated authority to support their demands and arguments.



# EXHIBIT 10

Defendant relied on the caselaw:  Williams v. City of Dallas, 178 F.R.D. 103, 110 (N.D. Tex. 1998) (finding "any and all documents related to" facially overbroad because "(it is limited neither by reasonable restrictions on time nor by particular documentary descriptions")). Not only does that quote not exist, the word particular does not either.



The case was administratively closed. Nevertheless, Defendant's citation treated it as binding precedent, and Defendant relied on that fabricated authority to support their demands and arguments.



PAGE 34

# EXHIBIT 11

Defendant relied on the caselaw:  Pearson v. Cincinnati Ins. Co., 2025 U.S. Dist. LEXIS 92488, at *12-13 (C.D. Cal. April 14, 2025) (granting a motion to quash in part because the subpoena is irrelevant and overbroad in seeking information that is not limited to the damage at issue in the case and extends to other projects and clients.). This caselaw seeks to present an outcome that is not inapplicable and misapplied as the motion was actually for 10 different subpoenas, about half of which were denied.



# EXHIBIT 12

Defendant relied on the caselaw: "the relevance of the requested materials, breadth of the requests, potential harm of disclosure to the movant, and the movant's reasonable privacy interests in the materials." Pate v. Pac. Harbor Line, Inc., 2023 U.S. Dist. LEXIS 52632, at *28-29 (C.D. Cal. Feb. 6, 2023). Not only does that quote not appear, the word "breadth" does not exist either.



The case was dismissed. Nevertheless, Defendant's citation treated it as binding precedent, and Defendant relied on that fabricated authority to support their demands and arguments.



# EXHIBIT 13

Defendant not only relied on fabricated caselaw in their demand letter, but also within their e-mails to Plaintiff. Some, but not all examples are below:

RE: Re:

EK    Ellena, Katherine J. <KEllena@reedsmith.com>
To   matthew@winteryear.com
Cc   Graue, Emily H.; Galibois, Michael B.

↩ Reply    ↩ Reply All    → Forward    ⋯

Wed 9/24/2025 11:36 AM

ⓘ You replied to this message on 9/25/2025 12:31 PM.
We removed extra line breaks from this message.

Mr. Walsh,

As previously stated, Rokoko will be moving to quash the subpoenas you issued September 12-15, 2025 and for a protective order. Rokoko will be moving for this relief on multiple grounds, listed below.

1.    The subpoenas were improperly issued. Fed. R. Civ. P. 45(a)(3) states that subpoenas must be issued by an attorney or the Clerk of Court. A non-lawyer in pro per cannot issue subpoenas. See e.g., Ekene v. Office L. Fowler, 2023 U.S. Dist. LEXIS 187409, at *3 (C.D. Cal. April 13, 2023) ("Plaintiff, proceeding pro se, may only serve a subpoena issued by the Clerk of this Court."). In this case, you issued the subpoenas without an attorney or court approval and they are therefore facially invalid.

2.    The subpoenas seek confidential information concerning Rokoko's relationships with other business partners and infringes on individual privacy interests. Rokoko's relationships with third parties such as Naver-Z, Trifork, and Corridor are subject to confidentiality provisions that preclude discovery into documents concerning those relationships under Fed. R. Civ. P. 45(d)(3)(B). Additionally, some of the subpoenas seek information related to personal email addresses and other personal information, which violates individual privacy rights.

3.    The subpoenas seek documents that are irrelevant to this case and harassing. Discovery must be grounded in the specific claims and defenses in the case. Fed. R. Civ. P. 26(b)(1). As just some examples, your subpoenas to Corridor and Wikimedia appear to pertain to an alleged defamation claim which is not at issue in this case. Additionally, your subpoenas to DocuSign pertains to individuals and companies with no relation to this case.

4.    The subpoenas are overbroad and unduly burdensome, including by demanding "all" or "any and all" documents. They also lack the specificity required to garner even potentially relevant documents.

In light of the above, Rokoko requests confirmation you will immediately withdraw the subpoenas.  Rokoko also reserves all rights to seek reasonable attorney's fees in connection with moving to quash the subpoenas and for a protective order, including pursuant to Fed. R. Civ. P., 45(d)(1), if you will not agree to withdraw the subpoenas.

Best Regards,

Katherine J. Ellena | Senior Associate
kellena@reedsmith.com

ReedSmith LLP
515 Flower St., Suite 4300 | Los Angeles, CA 90071 | Direct: 213.457.8254 | Cell: 424.302.1476 | Reception: 213.457.8000 | Fax: 213.457.8080 Abu Dhabi | Atlanta | Athens | Austin | Beijing | Brussels | Century City | Chicago | Dallas | Denver | Dubai | Frankfurt | Greece | Hong Kong | Houston | Kazakhstan | London | Los Angeles | Miami | Munich | New York | Paris | Philadelphia | Pittsburgh | Princeton | Richmond | San Francisco | Shanghai |Silicon Valley | Singapore | Tysons | Washington DC | Wilmington

PAGE 41

From: Ellena, Katherine J. <KEllena@reedsmith.com>
Sent: Friday, September 12, 2025 8:49 PM
To: matthew@winteryear.com; Graue, Emily H. <EGraue@reedsmith.com>; Valencia, Heather R. <HValencia@ReedSmith.com>; Galibois, Michael B. <MGalibois@reedsmith.com>
Subject: RE: RE:

Mr. Walsh,

As we mentioned before, any form of discovery is premature prior to the occurrence of a Rule 26(f) conference, which the parties have not conducted. *See* Fed. R. Civ. Pro. 26(d) (stating "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)."); *see also Lombana v. Green Tree Servicing, LLC*, 2016 U.S. Dist. LEXIS 187611, at *2-3 (C.D. Cal. 2016) (holding that when the parties have not met and conferred concerning a discovery plan, discovery requests are premature); *Babakhanlou v. Los Angeles Cnty.*, 2024 U.S. Dist. LEXIS 219792, at *3 (C.D. Cal. 2024) (same); *LeSzczynski v. Kitchen Cube LLC*, 2024 U.S. Dist. LEXIS 75252, at *5-7 (C.D. Cal. 2024) (same).

At no time have the parties held a Rule 26(f) conference, as a Rule 26(f) conference specifically addresses the creation of a discovery plan. On September 9, 2025, Judge Wright issued a Notice of Intent to Issue a Scheduling Order on November 17, 2025, with the instruction that the parties meet and confer pursuant to Rule 26(f) 21 days prior to that date. (Dkt. 71). Since then, you have served RFAs, Interrogatories, and RFPs on my client, in addition to multiple additional subpoenas on Docusign. Until that Rule 26(f) conference has been held, your discovery requests, including the subpoenas, are premature. While I am traveling this week for an unrelated matter, I will respond to you with my availability to conduct a Rule 26(f) conference as soon as I am able. In the interim, Rokoko reserves all rights to move to quash and/or seek a protective order over the improper discovery requests that you continue to serve.

As a logistical matter, please refrain from sending emails to my executive assistant, Heather Valencia, only. As an attorney of record for this matter, I ask that I be copied on any email that you send regarding this matter.

Thanks,
Kat

**Katherine J. Ellena** | Senior Associate
kellena@reedsmith.com

**ReedSmith** LLP
515 Flower St., Suite 4300 | Los Angeles, CA 90071 | Direct: 213.457.8254 | Cell: 424.302.1476 | Reception: 213.457.8000 | Fax: 213.457.8080
Abu Dhabi | Atlanta | Athens | Austin | Beijing | Brussels | Century City | Chicago | Dallas | Denver | Dubai | Frankfurt | Greece | Hong Kong | Houston | Kazakhstan | London | **Los Angeles** | Miami | Munich | New York | Paris | Philadelphia | Pittsburgh | Princeton | Richmond | San Francisco | Shanghai |Silicon Valley | Singapore | Tysons | Washington DC | Wilmington

# EXHIBIT 14

Defendant's email references caselaw *Lombana v. Green Tree Servicing, LLC*, 2016 U.S. Dist. LEXIS 187611, at *2-3 (C.D. Cal. 2016) (holding that when the parties have not met and conferred concerning a discovery plan, discovery requests are premature. The word "confer" does not appear. The decision is actually the granting of a Motion for Summary Judgment/adjudication without oral argument.



Additionally, The Court's findings in that matter had nothing to do with discovery obligations. In fact, Dkt #34 simply reminded the parties to confer on a discovery plan. About two months later they submitted a joint report. No such opinion exists (Case No. **2:14-cv-08330-JCG**)

# EXHIBIT 15

Johnson v. Dunn et al

Case 2:25-cv-05340-ODW-RAO    Document 77    Filed 09/29/25    Page 47 of 97    Page ID
#:1857

Doc. 204

FILED
2025 Jul-23 PM 03:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **FRANKIE JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1701-AMM** |
| | ) | |
| **JEFFERSON S. DUNN,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## SANCTIONS ORDER

This case is before the court because incarcerated Plaintiff Frankie Johnson accused Defendant Jefferson Dunn, the former Commissioner of the Alabama Department of Corrections, of fabricating citations to legal authorities in two motions. Docs. 187, 193. Three attorneys for Defendant Dunn (Matthew B. Reeves, William J. Cranford, and William R. Lunsford) confirmed in writing and at a hearing that the citations were hallucinations of a popular generative artificial intelligence ("AI") application, ChatGPT. *See* Docs. 194, 200. In simpler terms, the citations were completely made up.

The court must determine an appropriate sanction. Fabricating legal authority is serious misconduct that demands a serious sanction. In the court's view, it demands substantially greater accountability than the reprimands and modest fines that have become common as courts confront this form of AI misuse. As a practical

Dockets.Justia.com

matter, time is telling us – quickly and loudly – that those sanctions are insufficient deterrents. In principle, they do not account for the danger that fake citations pose for the fair administration of justice and the integrity of the judicial system. And in any event, they have little effect when the lawyer's client (here, an Alabama government agency) learns of the attorney's misconduct and continues to retain him.

An appropriate and reasonable sanction must (1) have sufficient deterrent force to make this misuse of AI unprofitable for lawyers and litigants, (2) correspond to the extreme dereliction of professional responsibility that sham citations reflect (whether generated by artificial or human intelligence), and (3) effectively communicate that made-up authorities have no place in a court of law.

For the reasons explained below, the court **PUBLICLY REPRIMANDS** Mr. Reeves, Mr. Cranford, and Mr. Lunsford for making false statements to the court; **ORDERS** publication of this order to effectuate that reprimand; **DISQUALIFIES** them from further participation in this case; and **REFERS** this matter to the Alabama State Bar and other applicable licensing authorities.

In the light of the results of the independent investigation commissioned by the attorneys' law firm, the court exercises its discretion not to suspend them from practice in the Northern District of Alabama. The court **RELEASES WITHOUT SANCTION** attorneys Daniel J. Chism and Lynette E. Potter, and the law firm Butler Snow LLP ("Butler Snow") from disciplinary proceedings.

2

## I.    BACKGROUND

### A.    Procedural Background

On May 7, 2025, Defendant Dunn filed a motion for leave to take the deposition of an incarcerated person under Federal Rule of Civil Procedure 30(a)(2)(B), which is required to depose any incarcerated person. Doc. 174. The signature block of that motion contained the names of four attorneys from the Butler Snow law firm: William J. Cranford, William R. Lunsford, Matthew B. Reeves, and Daniel J. Chism. *Id.* at 4. Mr. Cranford electronically filed the motion with his filing credentials. Plaintiff Johnson, the incarcerated person at issue, objected to being deposed prior to receipt of certain documents from the Alabama Department of Corrections that were the subject of a motion to compel by him. Doc. 186 at 2; *see also* Doc. 169. All parties agreed that Plaintiff Johnson was due to be deposed; the dispute was simply about when (Defendant Dunn wanted to conduct the deposition the week of June 3rd and Plaintiff Johnson wanted sometime later, after receipt of the documents at issue in his motion to compel).

On May 8, 2025, Defendant Dunn sought leave of court to file a motion to compel interrogatory answers and document production from Plaintiff Johnson. Doc. 178. The next day, the court granted that leave. Doc. 179. At 11:21 a.m.[1] on May 12, 2025, Defendant Dunn filed an unopposed motion for excess pages as to

---

[1] All times noted in this order are in Central Daylight Time.

3

the forthcoming motion to compel. Doc. 180. The court granted the motion for excess pages at 12:39 p.m. Doc. 181. Then, at 4:21 p.m. on May 12, 2025, Defendant Dunn filed his motion to compel. Doc. 182. Four Butler Snow attorneys appeared on the signature block of that motion: Mr. Cranford, Mr. Lunsford, Mr. Reeves, and Ms. Potter. *Id.* at 20. Ms. Potter has not entered a notice of appearance in this case.

Plaintiff Johnson's motion to compel became fully briefed on May 12, 2025. *See* Doc. 183. On May 14, 2025, the court granted in part and denied in part Plaintiff Johnson's motion to compel. Doc. 184.

The next day, Plaintiff Johnson filed a response to the motion for leave to depose him. Doc. 186. Plaintiff Johnson objected to a deposition the week of June 3rd on several grounds, including that counsel for Defendant Dunn appeared to have fabricated citations to legal authority in his motion for leave and motion to compel, "possibly through the use of generative artificial intelligence." *Id.* at 1.

In total, there were five problematic citations across two motions:

- Defendant Dunn cited "United States v. Baker, 539 F. App'x 937, 943 (11th Cir 2013)" as "confirming broad discovery rights under Rules 26 and 30." Doc. 174 at 2. As Plaintiff Johnson pointed out, "[w]hile *United States v. Baker*, **529** Fed. Appx. **987** (11th Cir. 2013) is an actual case, it is an appeal challenging a criminal's sentencing enhancement." Doc. 186 at 2. And the case found in the Federal Appendix numbers cited by Defendant Dunn does not discuss discovery. *See Williams v. Morahan*, 539 F. App'x 937 (11th Cir. 2013).

- Defendant Dunn cited "Kelley v. City of Birmingham, 2021 WL 1118031, at *2 (N.D. Ala. Mar. 24, 2021)" for the proposition that the district court "refus[ed] to delay deposition based on unrelated discovery issues."

4

Doc. 174 at 2. The only case with that style which Plaintiff Johnson (and the court) could find was an Alabama Court of Appeals case from 1939 that dealt with a traffic offense. Doc. 186 at 3; *see Kelley v. City of Birmingham*, 28 Ala. App. 644, 189 So. 921 (Ala. Ct. App. 1939).

• Defendant Dunn cited "Greer v. Warden, FCC Coleman I, 2020 WL 3060362, at *2 (M.D. Fla. June 9, 2020)" as "rejecting inmate's request to delay deposition until additional discovery was completed." Doc. 174 at 2. This case does not exist, nor does a case exist with a similar citation for that proposition of law. *See* Doc. 186 at 3.

• Defendant Dunn cited "Wilson v. Jackson, 2006 WL 8438651, at *2 (N.D. Ala. Feb. 27, 2006)" with the parenthetical that it was an opinion "granting [a] Rule 30(a)(2)(B) motion and finding no good cause to delay deposition of incarcerated plaintiff." Doc. 174 at 2. There is no such case, and that Westlaw number directs to a maritime personal injury case that does not discuss discovery. *See Douglas v. Ingram Barge Co.*, No. CV 3:04-0383, 2006 WL 8438651 (S.D.W. Va. Sept. 15, 2006); *see also* Doc. 186 at 4.

• Defendant Dunn cited "Williams v. Asplundh Tree Expert Co., No. 3:05-cv-479, 2006 WL 3343787, at *4 (M.D. Fla. Nov. 17, 2006)" to support the statement that, "General objections are not useful and will not be considered by the Court. Objections should be specific and supported by a detailed explanation." Doc. 182 at 13. Though a case with that style exists, no case with that combination of style and proposition exists. *See Williams v. Asplundh Tree Expert Co.*, No. 3:05-cv-00479-VMC-MCR (M.D. Fla. July 23, 2013); *see also* Doc. 186 at 4.

At 12:14 p.m. on Friday, May 16, 2025, the court issued a show cause order noting that "[i]n the light of the seriousness of the accusation, the court ha[d] conducted independent searches for each allegedly fabricated citation, to no avail," and ordering the signatories of Defendant Dunn's motion for leave, and the Butler Snow law firm, "to show good cause, if there be any, why they should not be sanctioned under Federal Rule of Civil Procedure 11, the court's inherent authority,

5

Local Rule 83.1(f), and/or Alabama Rule of Professional Conduct 3.3 for making false statements of fact or law to the court, not later than 3:00 PM Central Daylight Time on Monday, May 19, 2025." Doc. 187 at 1–2 (emphasis omitted). The court also set a show cause hearing for 9:00 a.m. Central Daylight Time on Wednesday, May 21, 2025 at the Hugo Black United States Courthouse. *Id.* at 2.

Three hours after the order to show cause issued, Mr. Lunsford and Mr. Chism filed a motion to be excused from the show cause hearing. Doc. 188. Mr. Chism and Mr. Lunsford represented that "[n]either [of them] participated in any way in the drafting or filing of the Motion for Leave to Depose Incarcerated Persons," and that Mr. Lunsford "must be in Macon, Georgia to [] prepare for and attend a previously set evidentiary hearing before the U.S. District Judge Marc Treadwell in the United States District Court for the Middle District of Georgia." *Id.* at 2.

> The court denied their requested excuse at 6:39 p.m. that same day:
>
> The hearing before Judge Treadwell is set for Thursday, May 22, 2025, at 9:00 AM Eastern Standard Time—twenty-three hours after the show cause hearing in this case. *See Ricardo Daughtry, et al. v. Shawn Emmons, et al.*, No. 5:15-cv-00041-MTT (M.D. Ga. filed Feb. 12, 2015). The May 21, 2025 show cause hearing will last no longer than an hour. Accordingly, Mr. Lunsford will have ample time to travel to Georgia in advance of his hearing the next day, and the motion to excuse as to Mr. Lunsford and Mr. Chism is **DENIED**.

Doc. 190 at 2. Several attorneys representing other parties sought and received excuses from the show cause hearing. Docs. 189–92, 196–97.

On Monday, May 19, 2025, the court issued a supplemental show cause order:

6

> Out of an abundance of caution, the court **CLAIRIFIES** its show cause order to the extent that (1) Defendant Dunn's motion to compel is also the subject of that show cause order and will be discussed at the hearing set for Wednesday, May 21, 2025 at 9:30 AM Central Daylight Time, and (2) in addition to the four attorneys on the motion for leave, Ms. Lynette E. Potter is **ORDERED** to show good cause, if there be any, why she should not be sanctioned under Federal Rule of Civil Procedure 11, the court's inherent authority, Local Rule 83.1(f), and/or Alabama Rule of Professional Conduct 3.3 for making false statements of fact or law to the court.

Doc. 193 at 2–3.

Later that day, Mr. Lunsford, Mr. Reeves, Mr. Cranford, and Mr. Chism filed their response to the show cause orders, admitting that the citations were hallucinated by ChatGPT: "In short, attorney Matt Reeves used ChatGPT to obtain case citations in support of two arguments made in the motions at issue without verifying their accuracy, and those citations proved to be false." Doc. 194 at 1. The response included declarations from each attorney. *See* Docs. 194-1–4.

Butler Snow then filed its response, called the events "unacceptable," and requested that "that any sanctions be proportionate to the wrong and commensurate with each attorney's role in these events," "that its client not be sanctioned, and for counsel to have the opportunity to file an amended motion with correct citations." Doc. 195 at 1–2. Ms. Potter later filed her response, Doc. 198, and a declaration, Doc. 198-1.

The court held the show cause hearing on May 21, 2025. Doc. 200. Counsel of record who were not previously excused, representatives from Butler Snow, and

7

a representative from the Alabama Attorney General's Office appeared.

Following the show cause hearing, the court allowed "supplemental responses to the order to show cause and briefs from anyone else who wishe[d] to file [one]." Doc. 199. Additionally, the court granted leave for Defendant Dunn to file corrected versions of the motions at issue, which he later filed. *See* Docs. 201–02. Butler Snow filed a supplemental response to the show cause orders on June 2, 2025. Doc. 203.

### B.    The Attorneys

Mr. Lunsford, Mr. Reeves, Mr. Cranford, Mr. Chism, and Ms. Potter spoke at the show cause hearing and filed supplemental declarations. Docs. 200, 203-3–7.

### 1.  William J. Cranford

Mr. Cranford is of counsel at Butler Snow. Doc. 194-3 ¶ 2. As to the motion for leave to depose, Mr. Cranford stated in his initial declaration that: (1) he "drafted the initial version of Dunn's Motion for Leave to Depose Incarcerated Persons"; (2) he "submitted the draft Motion for Leave for review to [his] direct supervisors, Matt Reeves, and Bill Lunsford" while copying Mr. Chism; (3) "[o]n May 7, 2025, Matt Reeves returned revisions to the draft Motion for Leave to [him]" and that "[t]he revisions included the string citation at issue . . . in paragraph two of the Motion for Leave"; (4) although he "reviewed [the edits] for grammatical and typographical issues, [he] did not conduct an independent review of the legal authorities added" and "incorporated the . . . revisions into a final draft of the Motion for Leave for

8

filing with the Court"; (5) "[u]pon approval from Matt Reeves, [he] electronically signed and filed the Motion for Leave on May 7, 2025"; and (6) he "possessed no knowledge that Matt Reeves utilized generative artificial intelligence to generate these citations when [he] filed the Motion." *Id.* ¶¶ 4–9.

As to the motion to compel, Mr. Cranford stated in his initial declaration that: (1) he "drafted the initial version of the Motion to Compel"; (2) "[o]n May 10, 2025, [he] submitted the draft Motion to Compel for review to [his] direct supervisors, Matt Reeves, and Bill Lunsford, and copied Daniel Chism"; (3) "[o]n May 11, 2025, Matt Reeves returned revisions to the draft Motion to Compel to [him]" and "included the block citations located on page thirteen of the Motion to Compel"; (4) that same day, "after receiving the revisions, [he] reviewed them for grammatical and typographical issues," but "did not conduct an independent review of the legal authorities added" and "incorporated the . . . revisions into a final draft of the Motion to Compel"; (5) he "submitted the revised Motion to Compel to Matt Reeves and Bill Lunsford for final approval on May 11, 2025, and received no further revisions"; (6) he "electronically signed and filed the Motion to Compel on May 12, 2025"; (7) "at the time of filing, [he] lacked any knowledge that Matt Reeves utilized generative artificial intelligence to generate the[ problematic] citations"; and (8) he "erroneously included Lynette Potter in the signature block of the Motion to Compel for the Butler Snow attorneys of record in the case." *Id.* ¶¶ 12–14, 17–21.

9

At the show cause hearing, Mr. Cranford apologized and "accept[ed] full responsibility." Doc. 200 at 18. He described his understanding of that responsibility: "I signed these motions. I understand that by signing these motions, I was verifying and accepting responsibility for the contents of those motions. And I take full responsibility for that. There's no excuse for not verifying these citations . . ." *Id.* at 18–19. He also described his practice for edits from supervisors:

> [I]n my normal practice, when I submit a draft to Mr. Reeves or Mr. Lunsford, if I receive revisions back, my typical practice is to incorporate those revisions, make sure they are factually accurate for the case since I usually have a more detailed understanding of the facts and the history, background of the case, and check for typographical or grammatical errors. In my normal practice, I do not typically check citations that are added from Mr. Lunsford or Mr. Reeves.

*Id.* at 19. Mr. Cranford represented that when he received the edits from Mr. Reeves, the edits in the motion for leave to depose were in redline and the edits in the motion to compel were in plain text. *Id.* at 19–20. He further represented that he was "unaware of any other instances of lawyers with [his] group using ChatGPT or an outside AI source for legal research or drafting of a legal document" besides Westlaw's CoCounsel product. *Id.* at 20.

In a supplemental declaration, Mr. Cranford stated that he has "never used any publicly accessible, generative artificial intelligence chatbot, such as OpenAI's ChatGPT, to generate legal or other authority citations for submission to any court." Doc. 203-5 ¶ 2.

10

Mr. Cranford did not have a "specific position" on an appropriate sanction other than to say that it is "within [the court's] discretion" and that he "accept[s] whatever the Court deems to be appropriate in this instance." Doc. 200 at 20–21.

### 2. Matthew B. Reeves

Mr. Reeves is a partner and assistant practice group leader in Butler Snow's constitutional and civil rights litigation group. Doc. 195 at 2.  He stated in his declaration that: (1) he was "responsible for revising Paragraph 2 of the Motion for Leave and Page 13 of the Motion to Compel, including the legal authorities cited therein"; (2) he "performed a search [on ChatGPT] to identify supporting case law for the proposition that discovery may proceed even during the pendency of other discovery issues, as to the Motion for Leave, and that general or boilerplate objections are not effective, as to the Motion to Compel"; (3) he "failed to verify the case citations returned by ChatGPT through independent review in Westlaw or PACER before including them in the Motion for Leave and Motion to Compel"; and (4) that the citations at issue are inaccurate or do not exist. Doc. 194-2 ¶¶ 3–5. Mr. Reeves further stated that this "was a serious error in judgment, and contrary to the requirements of Butler Snow LLP and [his] obligations to this Court." *Id.* ¶ 6.

At the show cause hearing, Mr. Reeves stated that has "had limited use" "with various AI products" "since approximately March of 2024." Doc. 200 at 21. Besides Westlaw's CoCounsel product, Mr. Reeves stated that he used ChatGPT. *Id.* at 21–

22. He "initially used [ChatGPT] for personal reasons, to look up things related to dietary-related matters," "to look up things when [his family went] on trips," "and when [his] youngest son started looking at colleges, doing some research on that for colleges and universities." *Id.* Then, he began using ChatGPT professionally. *Id.* at 22. Mr. Reeves gave examples of "basic" tasks such as "a general search of any sort of background, history kind of stuff" for "a witness that was going to be deposed" or "to go get a survey of what was out there publicly available . . . to get an idea of what the body of policies in the corrections world looked like." *Id.* He also stated that he "was aware of the limitation on use [of artificial intelligence products at Butler Snow]; and in this instance . . . [he] did not comply with the [firm's] policy," and that these are "the two instances" in which he used artificial intelligence and "did not verify the citations." *Id.* at 23.

In a supplemental declaration, Mr. Reeves stated that "[e]xcept in the motions already subject to the Court's Order to Show Cause," he has "never used any publicly accessible, generative artificial intelligence chatbot, such as OpenAI's ChatGPT, to generate legal or other authority citations for submission to any court." Doc. 203-4 ¶ 2. In addition, Mr. Reeves stated that he is working with Anil Mujumdar, counsel for Plaintiff Johnson and a professor at the University of Alabama School of Law, to develop "an informative program to educate law students regarding the risks of AI." *Id.* ¶¶ 3–4. Mr. Reeves "intend[s] to pursue this program and a similar program

12

at Samford University's Cumberland School of Law and Faulkner University's Thomas Goode Jones School of Law regardless of whether the Court orders it as relief in this case." *Id.* ¶ 5.

Mr. Reeves's position on sanctions "is that [he] understand[s] it is well within [the court's] discretion to provide whatever sanction [the court] deem[s] appropriate," and because he is "the one responsible for the error," he hopes that the court "would not punish [his] colleagues for that." Doc. 200 at 24.

### 3. William R. Lunsford

Mr. Lunsford is a partner and practice group leader of the constitutional and civil rights litigation group at Butler Snow. Doc. 194-1 ¶ 3. Mr. Lunsford began his initial declaration by "apologiz[ing] to the Court, to all parties, to opposing counsel and to the State of Alabama for the terrible decisions that led to an erroneous filing." *Id.* ¶ 2. He also stated that "[u]pon receipt of the Court's [show cause] Order (Doc. No. 187), [he] promptly contacted the Commissioner of the Alabama Department of Corrections, the General Counsel for the Department of Corrections and the Chief Counsel for the Attorney General to inform them of the Court's Order." *Id.* ¶ 5.

At the show cause hearing, the court asked about Mr. Lunsford's motion to be excused:

> THE COURT: . . . When you filed your motion to be excused, I think a few hours had elapsed since I had issued the show cause order.
>
> Had you at the time you filed the motion to be excused performed any

13

work to understand the extent or nature of the hallucinated citations or whether there might be any other such citations in this case or in others?

MR. LUNSFORD: The short answer is no, Your Honor. It was filed quickly in haste on a Friday afternoon when I did not appreciate the full context of the Court's order.

Doc. 200 at 25.

In his declaration, Mr. Lunsford also described his role in representing the

Alabama Department of Corrections and the State of Alabama:

I have had the honor of representing the Alabama Department of Corrections and its officials in various capacities (i.e. as directly retained counsel or counsel retained by third party contractors under indemnity obligations) over more than twenty (20) years. My name and signature appear on all of the current public contracts for professional services provided by outside legal counsel to the State of Alabama (the "State") on a limited number of matters for which the State elects to hire outside counsel. As such, I am the principal responsible attorney for all matters currently assigned to the firm regarding the Alabama Department of Corrections ("ADOC"). As a general matter, we have been retained to represent the State in systemic reform litigation brought against ADOC as well as a small number of individual plaintiff cases with a factual nexus to our pending systemic reform matters. I, along with my partner Matt Reeves, routinely monitor the assignment of attorneys within our firm to our matters for the State and its Department of Corrections in effort to effectively manage the representation of the State in each assigned matter.

For purposes of representing current and former ADOC officials in the individual plaintiff classes, such as the Johnson matter, we routinely assign one or two younger attorneys to the matter with Matt Reeves and I providing supervisory coverage. Due to the nature of our cases and work, Matt Reeves provides more of the day-to-day oversight, supervision and direction on the individual plaintiff's cases filed against current and/or former ADOC officials; however, I also provide supervision – particularly in times when the demands of our other cases or clients or personal events render Matt unavailable. Dan Chism and

14

> Will Cranford have been primarily assigned to represent ADOC and its current and former officials in the individual plaintiff cases since they began working with us more than two (2) years ago.

Doc. 194-1 ¶¶ 7–8; *see also* Doc. 200 at 25–26 (show cause hearing transcript).

As to the motion for leave to depose, Mr. Lunsford stated that he did not review the draft due to other work obligations. Doc. 194-1 ¶ 9. Mr. Lunsford stated that he did review the motion to compel:

> As with the Motion for Leave, Will Cranford drafted the initial Motion to Compel and he transmitted the draft to Matt Reeves for review at 11:43 a.m. on Saturday, May 10, 2025. Matt responded with revisions to the original draft at approximately 2:45 a.m. on Sunday, May 11, 2025. Will recirculated another draft of the Motion to Compel incorporating the revisions of Matt Reeves at 7:29 p.m. on Sunday, May 18, 2025. I briefly scanned the document on Sunday night and responded to Will via email within approximately fifteen minutes, indicating that I did not have any changes. My brief review focused more on the facts outlined as the basis for the motion to compel and the bolded headings of the legal arguments. I did not conduct any detailed or substantive review of the legal authorities. Given that the document had already undergone a review by Matt Reeves, I did not conduct any level of detailed review. I certainly did not conduct the level of detailed review that I would otherwise conduct if I was the sole reviewing attorney. Moreover, from my personal experiences with Will Cranford over the last two years, he has consistently demonstrated proficiency in promptly incorporating written feedback from his supervising attorneys and, as such, I did not have significant concerns about Will's incorporation of the changes provided by Matt Reeves.

*Id.* ¶ 10.

Mr. Lunsford described Mr. Reeves adding legal citations as a supervisory attorney to be "atypical" and "rare" in their group practice. *Id.* ¶ 11. He further stated:

> [O]ur historical process creates an expectation and mutual

15

understanding that the attorney crafting and adding legal authorities ensures their accuracy and, as such, I would not have expected Will Cranford to conduct such a review of a senior, supervisory attorney's additional legal arguments or authorities. Finally, this is the only instance in over a decade of working with Matt Reeves when I have ever encountered an instance when he added a citation that he failed to validate.

*Id.*

At the show cause hearing, when the court asked Mr. Lunsford to provide the "basis for [his] expectation that Mr. Cranford would have affixed his signature to the motions without reviewing the additional citations," Mr. Lunsford stated that "much of the law" and "much of the precedent" between the cases he oversees are "the same" "so there are a lot of occasions when Matt [Reeves] or [he] will see authority and/or see a place where authority might be missing and go pull from [their] other available resources and plug that into the document." Doc. 200 at 27. "And so the practice, the cadence that's developed over [almost fifteen years] is most of everything [Mr. Reeves or Mr. Lunsford] pull is from another brief or another previous writing where [they] know other authority exists." *Id.*

In his declaration, Mr. Lunsford described Butler Snow's "proactive" approach to artificial intelligence:

[Butler Snow] has been proactive in investigating, warning against and attempting to establish firm guidance on the use of the ever-evolving availability of products generated utilizing artificial intelligence. Under firm policy, the use of ChatGPT for legal research requires written approval from a practice group leader. I have yet to receive or approve any such request. I can state with certainty that our Firm has made the

16

> limitations upon the use of artificial intelligence abundantly clear to all of our attorneys. The conduct reported in this instance flies in the face of known Firm policy, which the Firm will handle internally. Moreover, I was not aware of any of our attorneys relying upon artificial intelligence of any kind to prepare any of our legal filings and I can assure this Court that I along with the leadership of the Firm are revisiting this issue to evaluate ways that we can ensure that these instances do not occur again.

Doc. 194-1 ¶ 12. In addition, at the show cause hearing, Mr. Lunsford stated that his team had discussions about Westlaw's artificial intelligence program, CoCounsel, and "a discussion when [their] vendor for court reporting transcripts began providing [them], free of charge for a period of time, AI summaries of a deposition." Doc. 200 at 28–29. Mr. Lunsford recalled that "there was equal parts amazement and concern," with "an immediate clear recognition that those [deposition] summaries could never be relied upon in drafting any documents." *Id.* at 29.

Mr. Lunsford represented at the show cause hearing that he "spent probably a collective four hours going through emails and reviewing redlines of drafts that Mr. Reeves had circulated," and did not find any additional problems like the ones at issue here. *Id.* at 30–31. That review included "three mediation statements," "a response to a court-monitoring report," "some smaller motions for leave," and "some summary judgment motions," but he also represented that "the firm's response to this is not complete yet." *Id.* at 30–33.

In a supplemental declaration, Mr. Lunsford stated that he has "never used any publicly accessible, generative artificial intelligence chatbot, such as OpenAI's

17

ChatGPT, to generate legal or other authority citations for submission to any court." Doc. 203-3 ¶ 2.

Mr. Lunsford did not have a position on appropriate sanctions that differed from that of Butler Snow. Doc. 200 at 33.

### 4. Daniel J. Chism

Mr. Chism is an associate at Butler Snow. Doc. 194-4 ¶ 2. In his declaration, he stated that although he "was copied on emails circulating drafts," he "did not draft, revise, or review the Motions [at issue]." *Id.* ¶ 4. Mr. Chism reaffirmed that statement at the show cause hearing. Doc. 200 at 17–18. In a supplemental declaration, he stated that he has "never used any publicly accessible, generative artificial intelligence chatbot, such as OpenAI's ChatGPT, to generate legal or other authority citations for submission to any court." Doc. 203-6 ¶ 2.

### 5. Lynette E. Potter

Ms. Potter is an attorney at Butler Snow. Doc. 198-1 ¶ 2. In her declaration, she stated that she "did not draft, edit, review, supervise, or approve the Motions or any drafts of the Motions," and "possessed no knowledge related to the preparation or filing of the Motions or any of their contents until May 16, 2025, when the Court entered its Show Cause Order." *Id.* ¶ 5. Ms. Potter reaffirmed those statements at the show cause hearing. Doc. 200 at 17–18. In a supplemental declaration, she stated that she has "never used any publicly accessible, generative artificial intelligence

18

chatbot, such as OpenAI's ChatGPT, to generate legal or other authority citations for submission to any court." Doc. 203-7 ¶ 2.

### C.    Butler Snow

Butler Snow filed an initial response, a supplemental response, and had representatives at the show cause hearing. *See* Docs. 195, 200, 203. Benjamin Watson, Butler Snow's general counsel, represented at the show cause hearing that Butler Snow believes that Mr. Lunsford and Mr. Chism's motion to be excused from the show cause hearing "should not have been filed" and that the firm was unaware of the motion before it was filed. Doc. 200 at 12–13.

Mr. Watson further represented at the show cause hearing that Butler Snow did not find similar issues in other filings in this case and within "nine filings from . . . three different cases." *Id.* at 13–14.

Butler Snow expanded this review after the show cause hearing and detailed those efforts in its supplemental response. That "extensive review" included examining "all filings in all Alabama federal courts and the Eleventh Circuit Court of Appeals on or after April 1, 2023, where counsel of record from this case, and also Lynette Potter, appeared on any filing." Doc. 203 at 1 (footnote omitted). "In total, the Butler Snow team reviewed 52 Alabama federal court dockets; of those, 40 dockets contained substantive citations for review. Butler Snow attorneys examined every citation in those 40 dockets and did not find any additional apparent AI-

generated 'hallucinations.'" *Id.* at 2 (citations omitted).

Separately, Butler Snow "at its own cost and expense" engaged Morgan, Lewis & Bockius LLP ("Morgan Lewis") to conduct an independent review. *Id.* at 2 & n.2. A team of twenty-eight attorneys at Morgan Lewis "verif[ied] all citations in those same 40 dockets in Alabama federal courts and the Eleventh Circuit Court of Appeals." *Id.* at 2. "In all, Morgan Lewis reviewed more than 2,400 separate legal citations across 330 filings." *Id.*

Scott Milner, a partner at Morgan Lewis, stated in a declaration that the review revealed no additional "legal citations that were fabricated," nor a legal citation that "was to a legitimate source but did not bear on the proposition for which it was cited." Doc. 203-2 ¶ 36. Mr. Milner is the practice group leader of the eData Practice Group at Morgan Lewis and has extended his practice "[o]ver the last several years" to artificial intelligence issues. *Id.* ¶¶ 1, 6.

Butler Snow also described its artificial intelligence policies both prior to and in response to this episode. To that end, Mr. Watson filed a declaration. Doc. 195-1. Mr. Watson stated that in June 2023, all Butler Snow attorneys received an email "stating that 'there are significant risks that LLM [Large Language Model] output can appear perfectly researched and logical while in fact it is wholly inaccurate.'" *Id.* at 2–3, 6. That same email implemented a policy which requires "written permission from the appropriate Practice Group Leader to use this new technology as a

20

secondary research tool, with full checks of the accuracy of any results through traditional legal research methods." *Id.* Similarly, when Butler Snow provided its attorneys access to Westlaw's CoCounsel platform in January 2025, it "adopted and distributed a policy" that "[a]ll outputs must be reviewed and verified by the responsible attorney before being presented to clients, filed with courts, or otherwise relied upon." *Id.* at 3, 9.

At the show cause hearing, counsel for Butler Snow confirmed that attorneys from the firm had written articles detailing the dangers associated with artificial intelligence in legal work and that, according to Butler Snow's then-existing policy, practice group leaders did not have to seek permission to utilize artificial intelligence. Doc. 200 at 10–12.

Mr. Watson stated in his initial declaration that Butler Snow has an artificial intelligence committee that is drafting "a comprehensive artificial intelligence policy." Doc. 195-1 at 3, 11–16. And after this incident, that he "sent a reminder to all Butler Snow attorneys of their ethical and professional duties to verify the accuracy of all citations or other authority presented to any court." *Id.* at 4, 17.

On a prospective basis, Mr. Watson stated that "Butler Snow will conduct additional and extensive firm-wide training on the appropriate use of artificial intelligence, including training to ensure that any citation to authority, no matter its source, is accurate, truthful, and unquestionably stands for the proposition for which

21

it is being offered." *Id.* at 4. In addition, "Butler Snow will be adopting a prefiling protocol requiring (a) review of all legal authority in any document to be filed with a court of law and (b) confirming the existence, accuracy, and relevance of each citation." *Id.* at 4–5.

Mr. Watson addressed other firm policy issues at the show cause hearing. He told the court that Butler Snow has "no specific policy" as to "who is on the signature block [of a filing] and who should appear and should not appear." Doc. 200 at 15. Instead, "it is left to the individual lawyer's discretion in terms of who should be on the signature block." *Id.* Mr. Watson represented that Butler Snow "need[s] to make clear" that junior attorneys who affix their signatures to a filing "must verify that" filing, even if a senior attorney sends it to them. *Id.* at 15–16.

Mr. Watson stated in his initial declaration that "Butler Snow is ultimately responsible for the acts of its attorneys and is prepared to accept any sanction that the Court deems appropriate, particularly in light of the seriousness of the conduct in this matter." Doc. 195-1 at 5. Mr. Watson echoed this at the show cause hearing: "So we stand ready to adhere to any sanction that you may deem appropriate." Doc. 200 at 16. In its supplemental response, Butler Snow made a specific request:

> Given the magnitude of the harm, the isolated nature of the harm, the significant publicity given to these events, and the remediation efforts undertaken by Butler Snow and attorney Reeves, Butler Snow respectfully requests that the Court limit any sanctions it may impose to a modest sanction upon it and to the exclusion of the affected clients in this litigation.

22

Doc. 203 at 5 (footnotes omitted).

Finally, Butler Snow represented that "[t]he State of Alabama will incur no expense or charge of any kind generated or incurred by the firm in connection with the erroneous filings, the proceedings related to those filings, or the remedial actions taken by the firm to respond to this matter, including the fees paid to Morgan Lewis." Doc. 203 at 2 n.2.

### D.    Office of the Alabama Attorney General

Attorney Brad Chynoweth attended the show cause hearing on behalf of the Alabama Attorney General. Doc. 200 at 7. He expressed that his office is "very concerned," "want[s] to ensure that there are no other instances of this in any other filings in corrections cases," and "Mr. Lunsford remains the [A]ttorney [G]eneral's counsel of choice." *Id.* at 38–40. Mr. Chynoweth stated that the Attorney General appointed Mr. Lunsford as a deputy attorney general to litigate on behalf of the State and that the "appointment process makes clear that the deputy attorney general can use the services of other attorneys in his firm." *Id.* at 39.

Mr. Chynoweth also noted that "there is no generative AI platform that is authorized for use" by the Attorney General's office. *Id.* at 40.

## II.    FINDINGS OF FACT & CONCLUSIONS OF LAW

Every lawyer knows that citing fake cases in a court filing is a terrible decision. No one here is attempting to defend it. In the few years that generative AI

23

has affected court filings, it has become well established that "[m]any harms flow from the submission of fake opinions." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023); *see, e.g.*, *Dehghani v. Castro*, No. 2:25-cv-00052-MIS-DLM, 2025 WL 1361765 (D.N.M. May 9, 2025); *Bevins v. Colgate-Palmolive Co.*, No. 25-576, 2025 WL 1085695 (E.D. Pa. Apr. 10, 2025); *Ferris v. Amazon.com Servs., LLC*, No. 3:24-cv-304-MPM-JMV, 2025 WL 1122235 (N.D. Miss. Apr. 16, 2025); *United States v. Hayes*, 763 F. Supp. 3d 1054 (E.D. Cal. 2025), *reconsideration denied*, No. 2:24-cr-0280-DJC, 2025 WL 1067323 (E.D. Cal. Apr. 9, 2025); *Sanders v. United States*, 176 Fed. Cl. 163 (Fed. Cl. 2025); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025); *Gauthier v. Goodyear Tire & Rubber Co.*, No. 1:23-cv-281, 2024 WL 4882651 (E.D. Tex. Nov. 25, 2024); *Park v. Kim*, 91 F.4th 610 (2d Cir. 2024).

Some such harms affect the case at hand: "The opposing party wastes time and money in exposing the deception," and "[t]he client may be deprived of arguments based on authentic judicial precedents." *Mata*, 678 F. Supp. 3d at 448. While the court takes time to investigate, other cases may be disrupted or deprived of judicial attention. Other harms affect the judicial system:

> There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct. It promotes cynicism about the legal profession and the American judicial system. And a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity.

24

*Id.* at 448–49. And the public (whose taxpayer dollars pay the lawyers at issue here) is justifiably horrified and outraged when filings in a court of law substitute lazy, convenient fictions for the truth.

Even in cases like this one, where lawyers who cite AI hallucinations accept responsibility and apologize profusely, much damage is done. The opposing party expends resources identifying and exposing the fabrication; the court spends time reviewing materials, holding hearings, deliberating about sanctions, and explaining its ruling; the substance of the case is delayed; and public confidence about the trustworthiness of legal proceedings may be diminished.

Accordingly, the court makes the following findings of fact and conclusions of law.

### A.    False Statements of Law

The court finds, based upon its own careful review and as no one contests, that the hallucinated citations in the two motions at issue were false statements of law. *See* Docs. 194, 200.

### B.    Sanctions Authorities

Rule 11(b) provides that "[b]y presenting to the court a pleading, written motion, or other paper[,] . . . an attorney . . . certifies that . . . after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law." Fed. R. Civ. P. 11(b)(2).

25

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." *Id.* (c)(1). "Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." *Id.* "A sanction imposed under [Rule 11] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and "may include nonmonetary directives." *Id.* (c)(4).

"Rule 11 . . . imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991). Rule 11 focuses on "the signer's conduct" "at the time of filing." *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995) (emphasis and internal quotation marks omitted). "[T]he purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility." *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 126 (1989) (holding, prior to the 1993 amendment to Rule 11, that sanctions may be imposed on the individual attorney who signs the papers and not on the attorney's law firm).

To impose Rule 11 sanctions *sua sponte*, the court must find that offending conduct is "akin to contempt." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003). This court does not understand that standard to require a

26

finding of subjective bad faith. Such a requirement would be inconsistent with explanations from the Supreme Court and the Eleventh Circuit that Rule 11 is objective, *see, e.g.*, *Chambers*, 501 U.S. at 47; *Jones*, 49 F.3d at 695, and the reality that "[a]s originally drafted, Rule 11 set out a subjective standard, but the Advisory Committee determined that this standard was not working," *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 549 (1991).

In 1993, Rule 11 was amended to provide that it "does not apply to . . . motions under Rules 26 through 37." Fed. R. Civ. P. 11(d). The advisory committee's note explains that:

> Rules 26(g) and 37 establish certification standards and sanctions that apply to discovery disclosures, requests, responses, objections, and motions. It is appropriate that Rules 26 through 37, which are specially designed for the discovery process, govern such documents and conduct rather than the more general provisions of Rule 11. Subdivision (d) has been added to accomplish this result.

Fed. R. Civ. P. 11 advisory committee's note 1993 amendment.

Local Rule 83.1(f) provides that attorneys may be disciplined for acts or omissions that are inconsistent with the local rules, the *Alabama Rules of Professional Conduct*, and the *American Bar Association Model Rules of Professional Conduct*. N.D. Ala. R. 83.1(f). It further provides that "[d]iscipline under this Rule may consist of disbarment, suspension, censure, reprimand, removal from a particular case, ineligibility for appointment as court-appointed counsel, ineligibility to appear under subsections (b) and (c), monetary sanctions, or any other

27

sanction the court may deem appropriate." *Id.*

Alabama Rule of Professional Conduct 3.3 provides that "[a] lawyer shall not knowingly . . . [m]ake a false statement of material fact or law to a tribunal." Ala. Rules of Pro. Conduct r. 3.3(a)(1). The comments to the Rule provide that "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." Ala. Rules of Pro. Conduct r. 3.3. cmt. They further provide that "[l]egal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities." *Id.*

The sanction authority of the court is not limited to these rules. For more than two hundred years, "[i]t has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers*, 501 U.S. at 43 (quoting *United States v. Hudson,* 7 Cranch 32, 34 (1812)).

"Courts have long recognized an inherent authority to suspend or disbar lawyers . . . derive[d] from the lawyer's role as an officer of the court which granted

28

admission." *In re Snyder*, 472 U.S. 634, 643 (1985). Thus, "a federal court has the power to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43 (citing *Ex parte Burr*, 22 U.S. 529, 530 (1824)). "An attorney who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment." *Connick v. Thompson*, 563 U.S. 51, 66 (2011).

Although Rule 11 "reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses." *Chambers*, 501 U.S. at 46. "A court must . . . exercise caution in invoking its inherent power," and "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Id.* at 50. "[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.*

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45. The Supreme Court has held that even "particularly severe sanction[s]" are "within the court's discretion." *Id.* at 45 (discussing "outright dismissal of a lawsuit" as a sanction).

A finding of subjective bad faith or something tantamount to it is necessary to support a sanction issued pursuant to a court's inherent power. *See Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir. 1997)); *accord Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002).

"If particularly egregious, the pursuit of a claim without reasonable inquiry into the underlying facts can be the basis for a finding of bad faith." *Barnes*, 158 F.3d at 1214. "[I]n the absence of direct evidence of subjective bad faith, [the bad-faith] standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Purchasing Power*, 851 F.3d at 1224–25; *accord Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980) (stating that inherent powers require a finding that "counsel's conduct . . . constituted or was tantamount to bad faith"). "This is not the same as simple recklessness, which can be a starting point but requires something more to constitute bad faith." *Purchasing Power*, 851 F.3d at 1225 (citing *Barnes*, 158 F.3d at 1214).

### C.      Findings and Conclusions as to Each Attorney and Butler Snow

Because the motions at issue are discovery motions under Rules 30 and 37, Rule 11 "does not apply." Fed. R. Civ. P. 11(d); Docs. 174, 182. This appears to be an unintended anomaly in Rule 11: the advisory committee's note indicates that discovery motions were excepted from Rule 11 because the committee expected Rules 26 and 37 to allow courts to address sanctionable misconduct in such motions, but Rules 26 and 37 furnish no basis for the court to address the false statements of law these attorneys made in discovery motions. *See* Fed. R. Civ. P. 11 advisory committee's note 1993 amendment; Fed. R. Civ. P. 26, 37. Regardless, Rule 11 says what it says, it does not apply here, and this court has no authority to change that.

Further, it is unclear to the court that Alabama Rule of Professional Conduct 3.3 applies to the misconduct at issue here. On the one hand, inserting into court filings unverified legal citations generated by AI is wholly inconsistent with the duty of candor that Rule 3.3 enumerates. On the other hand, by its terms Rule 3.3 forbids only knowing misstatements of law, and these false statements occurred because none of the three attorneys at issue bothered to verify the hallucinated citations (and two of them did not know that the citations had been generated by AI). As far as the court can discern, the Alabama Supreme Court has not yet had the opportunity to consider whether Rule 3.3 applies to this specific kind of misconduct. Absent such guidance, the court will not extend that rule beyond its plain terms.

31

Likewise, Local Rule 83.1(f) does not clearly forbid this misconduct. Rule 83.1(f) forbids (among other things) violations of the Alabama Rules of Professional Conduct in this federal district; it does not set out a separate and independent universe of forbidden conduct relevant here.

This series of gaps leaves the court with only its inherent authority. These are precisely the kind of gaps that the inherent authority must fill: although no specific rule expressly forbids the misconduct that occurred here, on the whole the rules make clear that it is serious misconduct ever to make false statements to a court, and no one here suggests that false statements generated by AI and parroted without verification in discovery motions are allowed. Indeed, Butler Snow appears to understand that it is a Rule 11 violation to sign a motion that parrots false statements generated by AI. *See* Doc. 195 at 5 ("Butler Snow does not dispute that it is within the Court's discretion to sanction counsel's conduct under Rule 11."); Doc. 203 at 4 (Butler Snow, making arguments about appropriate sanctions under Rule 11 without discussing the exception for discovery motions).

The court thus assesses individually each lawyer's conduct, as well as the firm's, to determine whether it was bad faith or tantamount to it.

### 1.  Lynette E. Potter

Ms. Potter stated in her declaration that she "did not draft, edit, review, supervise, or approve the Motions or any drafts of the Motions," and "possessed no

32

knowledge related to the preparation or filing of the Motions or any of their contents until May 16, 2025, when the Court entered its Show Cause Order." Doc. 198-1 ¶ 5. Nothing in the record contradicts this account. Therefore, the court releases Ms. Potter from these disciplinary proceedings.

### 2. Daniel J. Chism

Mr. Chism stated in his declaration that although he "was copied on emails circulating drafts," he "did not draft, revise, or review the Motions [at issue]." Doc. 194-4 ¶ 4. Nothing in the record contradicts this account. Mr. Chism is an associate at Butler Snow without supervisory responsibility and no indication appears in the record that he delegated the use of his signature on these motions. Accordingly, the court releases Mr. Chism from these disciplinary proceedings.

### 3. Butler Snow

Butler Snow proactively addressed the challenges of AI as early as June 2023, when all Butler Snow attorneys received an email from the firm's general counsel warning them "that 'there are significant risks that LLM [Large Language Model] output can appear perfectly researched and logical while in fact it is wholly inaccurate.'" Doc. 195-1 at 2–3, 6. In that same email, the firm announced a policy that requires "written permission from the appropriate Practice Group Leader to use this new technology as a secondary research tool, with full checks of the accuracy of any results through traditional legal research methods." *Id.* at 6. (It was this very

policy that Mr. Reeves admitted he violated. *See* Doc. 194-2 ¶ 6.) At some point thereafter, the firm created an AI committee that made substantial progress on a more comprehensive firmwide AI policy. *See* Doc. 195-1 at 11–16. As these efforts were ongoing, individual Butler Snow attorneys (including Ms. Potter) wrote and published articles detailing the dangers associated with misuse of AI in legal work. Doc. 200 at 10–11.

After the court issued its show cause orders in this case, Butler Snow escalated its internal warning efforts. *First*, Mr. Watson "sent a reminder to all Butler Snow attorneys of their ethical and professional duties to verify the accuracy of all citations or other authority presented to any court." Doc. 195-1 at 4, 17. *Second*, the firm "will conduct additional and extensive firm-wide training on the appropriate use of artificial intelligence, including training to ensure that any citation to authority, no matter its source, is accurate, truthful, and unquestionably stands for the proposition for which it is being offered." *Id.* at 4. *Third*, the firm is updating its policies with lessons learned from this episode. For example, "Butler Snow will be adopting a prefiling protocol requiring (a) review of all legal authority in any document to be filed with a court of law and (b) confirming the existence, accuracy, and relevance of each citation." *Id.* at 4–5. In addition, Butler Snow represented at the show cause hearing that it "need[s] to make clear" that junior attorneys who affix their signatures to a filing "must verify that" filing, even if a senior attorney sends it to them. Doc.

34

200 at 15–16.

Butler Snow understood the seriousness of these proceedings and responded accordingly. It called these events "unacceptable" and apologized in its initial response, Doc. 195 at 1, then it expressed similar contrition at every subsequent step. Acting on these sentiments, Butler Snow expended significant time and resources to investigate and remediate these issues through both an internal investigation of citations and a parallel investigation by Morgan Lewis. *See* Doc. 203 at 2. And at the show cause hearing, Butler Snow represented that Mr. Lunsford and Mr. Chism's motion to be excused from the show cause hearing "should not have been filed," and that the firm was unaware of the motion before it was filed. Doc. 200 at 13.

The court is well aware that the record may not reflect the fullness of Butler Snow's internal response to the violation of firm policy. At the show cause hearing, when Mr. Lunsford described these disciplinary proceedings as "fresh and raw," he explained that "the firm's response to this is not complete yet." Doc. 200 at 33.

In terms of legal arguments, "Butler Snow d[id] not dispute that it is within the Court's discretion to sanction counsel's conduct under Rule 11," and acknowledged that "[a] law firm must be held jointly responsible for a violation committed by its partner, associate, or employee, absent exceptional circumstances." Doc. 195 at 5 (citing Fed. R. Civ. P. 11(c)). Butler Snow has determined that "this was an isolated event" where "a single attorney failed to follow [firm] policies and

35

procedures and used unverified AI on the two filings in question." Doc. 203 at 3–4.

Butler Snow also argues that the court should consider, among other things, the "magnitude of the harm" and the "significant publicity given to these events" to "limit any sanctions it may impose to a modest sanction upon [Butler Snow] and to the exclusion of the affected clients." *Id.* at 5 (citing media reports). Butler Snow observes that "as shown by the corrected briefs, the legal propositions stated were not erroneous." *Id.* at 4–5.

At the threshold, the court rejects the invitation to consider that actual authorities stand for the proposition that the bogus authorities were offered to support. That is a stroke of pure luck for these lawyers, and one that did not remediate the waste and harm their misconduct wrought. Further, any sanctions discount on this basis would amplify the siren call of unverified AI for lawyers who are already confident in their legal conclusion. This court will have no part of that.

Likewise, the court rejects the invitation to consider that the involved lawyers and firm have been deeply embarrassed in media reports. For many very good reasons, courts traditionally have not relied on the media to do the difficult work of professional discipline, and this court is not about to start.

When the court turns to the appropriate scope of its analysis as to Butler Snow — the firm's own conduct — it finds that Butler Snow acted reasonably in its efforts to prevent this misconduct and doubled down on its precautionary and responsive

36

measures when its nightmare scenario unfolded. Accordingly, the court sees no evidentiary basis for a finding that the firm acted in bad faith or with such recklessness that its conduct was tantamount to bad faith. The court therefore releases the firm from disciplinary proceedings.

### 4. Matthew B. Reeves

Mr. Reeves admits that he utilized AI to generate the legal citations at issue, that he added them to both draft motions without verifying them, and that all of this was "contrary to the requirements of Butler Snow LLP and [his] obligations to this Court." Doc. 194-2 ¶¶ 3–6. As the court understands Mr. Reeves's position, he does not contest his responsibility in any way and would prefer to be held solely responsible. *See* Doc. 200 at 24. And the court credits Mr. Reeves's representation that he will use his own experience in this case to warn law students and other lawyers of the consequences they might face if they make a similar decision regarding the use of AI. *See* Doc. 203-4 ¶¶ 3–5.

The court has no difficulty finding that Mr. Reeves's misconduct was more than mere recklessness. In the light of repeated general warnings from federal courts about the risks of bogus citations generated by AI, as well as the persistent specific warnings, policies, and expectations of his colleagues and law firm with respect to AI, Mr. Reeves's misconduct was particularly egregious. Having been so extensively alerted of the risk that AI will make things up, and having blown through

37

all of his firm's internal controls designed to protect court filings from counterfeit citations, Mr. Reeves's repeated decisions to parrot citations generated by AI without verifying even one of them reflect complete and utter disregard for his professional duty of candor. This is recklessness in the extreme, and it is tantamount to bad faith. Accordingly, the court will impose an appropriate sanction under its inherent authority.

### 5.  William J. Cranford

Mr. Cranford drafted, signed, and personally filed both motions at issue. Doc. 194-3 ¶¶ 4–19. He included the fabricated citations in these filings without reviewing any of them after Mr. Reeves inserted them. *Id.* ¶¶ 7, 17. Although Mr. Cranford did not know that Mr. Reeves used generative AI, Mr. Cranford had an obligation to check the citations before signing the motions and filing them with the court. Any reasonable investigation (indeed, even the most cursory of investigations, or a spot check) would have quickly revealed the problem. Mr. Cranford acknowledged his culpability at the show cause hearing: "I understand that by signing these motions, I was verifying and accepting responsibility for the contents of those motions. And I take full responsibility for that." Doc. 200 at 18–19.

At the threshold, the court observes that if these motions had not been discovery motions, Mr. Cranford's conduct would have been a textbook Rule 11 violation. In any event, Mr. Cranford failed to discharge his most basic responsibility

38

as an attorney signing and filing motions with the court: to make sure that the statements in the motions were true. Mr. Cranford's repeated decisions to make no effort in this regard reflect a troubling indifference to the veracity of his court filings and disinterest in the most rudimentary demands of professional responsibility. This misconduct was more than simple recklessness and is particularly egregious, especially in the light of how little effort would have been required of Mr. Cranford to uncover any of the falsehoods. The unacceptable result of Mr. Cranford's decisions is that motions were filed with the court that no attorney ensured were free from false statements. Attorneys who sign motions must know — as Mr. Cranford acknowledges — that they risk serious sanctions when they make no effort to ensure that those motions tell the truth. Accordingly, the court finds that Mr. Cranford's misconduct was tantamount to bad faith and will sanction him under its inherent power.

To be clear, not every error in a motion is recklessness or more. To err is human, and minor typographical errors, even in citations, occasionally occur despite attorneys' best efforts. Likewise, some factual or legal authorities are the subject of reasonable debate, and a mere disagreement with one side's view does not necessarily mean that the view is objectively false. The insertion of bogus citations is not a mere typographical error, nor the subject of reasonable debate.

### 6. William R. Lunsford

Mr. Lunsford stated in his declaration that he did not review the motion for leave to depose and did review the motion to compel. Doc. 194-1 ¶¶ 9–10. Nevertheless, in accordance with his practice group's ordinary workflow, Mr. Lunsford allowed Mr. Cranford to use his name in the signature block on both motions. *See id.* ¶¶ 9–11; *see generally* Doc. 200 at 25–26 (discussing how the "youngest lawyers primarily draft the documents"). As Mr. Lunsford stated in his declaration, his "name and signature appear on all of the current public contracts for professional services provided by outside legal counsel to the State of Alabama (the "State") on a limited number of matters for which the State elects to hire outside counsel." Doc. 194-1 ¶ 7. "As such, [he is] the principal responsible attorney for all matters currently assigned to [Butler Snow] regarding the Alabama Department of Corrections ("ADOC")." *Id.* And as the Alabama Attorney General's Office explained, Mr. Lunsford personally holds the designation of deputy attorney general; that designation allows him to represent Defendant Dunn and employ other attorneys in his firm (who do not have such a designation) to assist him. Doc. 200 at 39.

Mr. Lunsford did not know that Mr. Reeves utilized generative AI. Like Mr. Cranford, Mr. Lunsford simply made no effort whatsoever to verify the contents of the motions for himself (or even to ask someone else to check for him), despite his presence on these motions.

40

Outside of his hastily filed request to be excused from the show cause hearing, Mr. Lunsford has not argued that he is somehow not responsible for the false statements made to the court. *See* Doc. 194-1 ¶¶ 2, 6–7, 9–10, 13; *see also* Doc. 200 at 25–26. Indeed, when the firm explained its position that it understood it may be sanctioned, and he was offered the opportunity to explain how his position might differ from the firm's, he accepted the firm's position. Doc. 200 at 33.

Both before and at the show cause hearing, Mr. Lunsford deepened rather than allayed the court's concerns about his understanding of his professional responsibility with respect to court filings that bear his name in the signature block.

*First,* Mr. Lunsford's request to be excused from the show cause hearing reflected an intense lack of concern for the seriousness of the misconduct that both Plaintiff Johnson and the court had described. *See* Doc. 188. Either Mr. Lunsford personally reviewed the show cause order and decided to try to skip the hearing despite the accusation of fabricated citations, or he failed to personally review the order and made no effort to evaluate the seriousness of the issue before asking for a pass. Either way, Mr. Lunsford's hasty excuse request troubled the court.

*Second*, after the court denied Mr. Lunsford's request and before the hearing, Mr. Lunsford explained in his declaration his ordinary practices and his team's workflow. *See* Doc. 194-1. He stated that this "this is the only instance in over a decade of working with Matt Reeves when [Mr. Lunsford] ha[s] ever encountered

41

an instance when [Mr. Reeves] added a citation that he failed to validate." *Id.* ¶ 11. This is a big statement about ten years of work-product, but it came with no citation or other basis: Mr. Lunsford did not describe any workflow, nor any investigation, that would involve him actually evaluating, let alone ensuring, whether or how citations were validated, either in real time or historically. And other statements in his declaration undercut this hyperbole: he explained that as a rule, he simply assumes that other people verify citations. *See id.*

*Third,* at the hearing, when the court asked Mr. Lunsford about his use of AI, he explained that because the cases he handles as a deputy attorney general often involve similar facts and law, when the team he leads has a need for legal research in a case, it is their ordinary practice to re-use (apparently without verification) material from filings in other cases. *See* Doc. 200 at 27. This practice, Mr. Lunsford implied, obviated any need to rely on AI. *See id.* In any event, Mr. Lunsford made clear that performing (or verifying) legal research for each case is not something that he requires of the team he leads.

Mr. Lunsford's statements at the hearing appear to the court to have deepened the concern at Butler Snow. Although the firm had conducted a preliminary investigation in the few days between the issuance of the show cause orders and the show cause hearing, it substantially broadened that investigation after the hearing, both investigating for itself and commissioning an independent investigation of

42

every filing (that contained citations) in every case "in all Alabama federal courts and the Eleventh Circuit Court of Appeals" where Mr. Lunsford, Mr. Cranford, Ms. Potter, Mr. Chism, or Mr. Reeves appeared on any filing since April 1, 2023. *See* Doc. 203 at 1–2. This was a very significant (and no doubt extremely expensive) undertaking.

On this factual record, the court has no difficulty finding that Mr. Lunsford bears responsibility for the false statements of law made to the court over his name in the signature block. He acknowledges as much and has apologized. *See* Doc. 194-1 ¶¶ 2, 6–7, 9, 13. Indeed, although Mr. Lunsford did not personally use AI to generate citations and did not personally file the motions at issue, the record does not suggest that he would have done anything differently than Mr. Cranford did, nor that he expected Mr. Cranford to do anything differently. According to Mr. Lunsford's own testimony, he did not make any effort to verify the contents of the motion to compel before authorizing its filing, and it would have been extremely unusual for him to do so. Nor did he require (or even ask) Mr. Cranford or Mr. Reeves, or any other attorney (or person), to undertake that task. Nor was it his practice to require (or ask) that of them.

Like Mr. Cranford and Mr. Reeves, Mr. Lunsford simply assumed the truth of what was in the draft, and/or assumed that someone else would check on that. This is the same indifference to the truth and complete personal disinterest in the most

basic professional responsibility that Mr. Cranford displayed. Particularly in the light of Mr. Lunsford's roles as practice group leader, supervisory attorney, and partner — and the reality that he is the only lawyer on the team entrusted with the necessary deputy attorney general designation — this utter disregard for the truth of filings bearing his name in the signature block is particularly egregious, more than mere recklessness and tantamount to bad faith.

To be clear, the court's finding in this regard is not simply a harsh inference: when it became apparent that multiple motions with his name in the signature block contained fabricated citations, Mr. Lunsford's nearly immediate response was to try to skip the show cause hearing and leave the mess for someone else. And when the court compelled him to appear at the hearing, he paired his apology with an explanation in greater fullness of how very little work he personally puts in to be sure that his team's motions tell the truth. This cannot be how litigators, particularly seasoned ones, practice in federal court or run their teams. Accordingly, the court will impose an appropriate sanction under its inherent authority.

### D.    Sanctions

To exercise its inherent power with restraint and discretion, the court looks first to the purpose of that power. "The purpose of the inherent power is both to vindicate judicial authority without resorting to contempt of court sanctions and to make the non-violating party whole." *Purchasing Power*, 851 F.3d at 1225 (citing

44

*Chambers*, 501 U.S. at 45–46). "This power is . . . for rectifying disobedience, regardless of whether such disobedience interfered with the conduct of the trial." *Id.*

To rectify the bad-faith misconduct in this case and vindicate the lawful authority of federal courts to keep proceedings free from falsehoods, the court will impose the least severe sanction that the court finds likely to deter future similar misconduct. As the court exercises its inherent power in this factual context, it assigns primary value to the deterrent function of a sanction, for several reasons. *First*, this kind of AI misuse is a serious and time-sensitive problem that, unless it is arrested promptly, will impose escalating undue costs on litigants, cause extensive disruptions for courts, and damage public confidence in the legal community and the integrity of the justice system. At a minimum, protecting judicial authority requires effective preventive measures designed to reduce the practical likelihood that this kind of AI misuse continues apace.

*Second*, Rule 11 assigns particular value to the deterrent function of a sanction. *See* Fed. R. Civ. P. 11(c)(4) (providing that sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated"). Although Rule 11 does not control the court's analysis because the motions at issue happen to be discovery motions, it is persuasive authority about the purpose that a sanction for false statements of law must serve.

And *third*, there is persuasive precedent in this Circuit for calibrating

45

sanctions issued pursuant to a court's inherent power to serve deterrence purposes. *See Boe v. Marshall*, 767 F. Supp. 3d 1226, 1295–97 (M.D. Ala. 2025) (imposing sanctions for bad-faith judge-shopping to serve deterrence purposes).

As the court considers an appropriate sanction, it also examines other cases involving false statements of law generated in the first instance by AI. In *Mata* and *Hayes*, which involved AI hallucinations that the lawyers first defended as real (before accepting responsibility), the district courts imposed modest monetary sanctions (ranging from $1,500 to $5,000) and notification requirements. *Mata*, 678 F. Supp. 3d at 449, 466; *Hayes*, 763 F. Supp. 3d at 1067, 1070, 1073.

Courts across the country have reacted similarly to other incidents involving misuse of artificial intelligence where the involved lawyers promptly accepted responsibility. *See, e.g.*, *Versant Funding LLC v. Teras Breakbulk Ocean Navigation Enters., LLC*, No. 17-cv-81140, 2025 WL 1440351, at *7 (S.D. Fla. May 20, 2025) (imposing monetary sanctions ranging from $500 to $1,000); *Ramirez v. Humala*, No. 24-cv-424-RPK-JAM, 2025 WL 1384161, at *3 (E.D.N.Y. May 13, 2025) (imposing a $1,000 monetary sanction); *Nguyen v. Savage Enters.*, No. 4:24-cv-00815-BSM, 2025 WL 679024, at *1 (E.D. Ark. Mar. 3, 2025) (imposing a $1,000 monetary sanction); *Wadsworth*, 348 F.R.D. at 499 (imposing monetary sanctions ranging from $1,000 to $3,000); *Gauthier*, 2024 WL 4882651 at *3 (imposing a $2,000 monetary sanction); *see also Lacey v. State Farm Gen. Ins. Co.*, No. 2:24-

cv-05205-FMO-MAA, 2025 WL 1363069, at *5 (C.D. Cal. May 5, 2025) (ordering plaintiff's law firms to pay defendants $31,100 in fees and costs).

And at least some of these courts have sanctioned law firms and/or lawyers who were unaware of the AI misuse in real time. *See, e.g.*, *Wadsworth*, 348 F.R.D. at 493–94, 498–99 (sanctioning attorneys who "were not provided a copy of the [sanctionable] Motions to review prior to filing" and were not aware that artificial intelligence had been utilized but had delegated their signatures, reasoning that they "had a nondelegable duty to ensure a motion or filing is supported by existing law"); *Versant Funding LLC*, 2025 WL 1440351, at *5–*7 (imposing sanctions on local counsel for "filing a response without ensuring the accuracy of the case citation and principle of law" despite "t[aking] no part in" *pro hac vice* counsel's drafting process utilizing AI).

Having considered these cases carefully, the court finds that a fine and public reprimand are insufficient here. If fines and public embarrassment were effective deterrents, there would not be so many cases to cite. And in any event, fines do not account for the extreme dereliction of professional responsibility that fabricating citations reflects, nor for the many harms it causes. In any event, a fine would not rectify the egregious misconduct in this case.

The court finds that (1) a public reprimand paired with a limited publication requirement, (2) disqualification, and (3) referral to applicable licensing authorities

47

are necessary to rectify the misconduct here and vindicate judicial authority. Disqualification fits well: lawyers should know that if they make false statements in court proceedings, they will no longer have the professional opportunity to participate in those proceedings. Similarly, litigants should have assurance that false statements will not be allowed in their cases, and no court should be required to allow an attorney responsible for making false statements in the proceedings to continue in the proceedings. Likewise, a public reprimand with limited publication fits: it makes other clients, counsel, and courts aware of the lawyer's misconduct so that they may assess whether any measures are needed to protect their proceedings. Finally, the referral to licensing authorities is a bare minimum in the light of the primary nature of a lawyer's professional responsibility not to make things up.

The court further finds that no lesser sanction will serve the necessary deterrent purpose, otherwise rectify this misconduct, or vindicate judicial authority. Mr. Cranford, Mr. Reeves, and Mr. Lunsford are well-trained, experienced attorneys who work at a large, high-functioning, well-regarded law firm. They benefitted from repeated warnings, internal controls, and firm policies about the dangers of AI misuse. They have regular access to gold-standard legal research databases. They must have known they would be deeply embarrassed in this kind of situation, and that there could be harsh consequences with the court and their law firm. And yet here we are. The reality that this lapse in judgment presented in the most

48

spectacularly unforced fashion underscores the need for more than a fine and reprimand.

The court further finds that any greater sanction would be excessive in the vindication of judicial authority. Butler Snow's internal review, as well as Morgan Lewis's independent investigation, reassure the court that suspension from the practice of law in the Northern District is not necessary to protect other courts or cases. And the court is mindful and appreciative that the involved lawyers are sincerely apologetic and remorseful, and that Mr. Reeves is committed to educating others about these matters as a preventive measure.

The court is well aware that disqualification "often work[s] substantial hardship on the client," *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982), but the court does not find hardship here. At the show cause hearing, the representative of the Alabama Attorney General did not suggest any hardship for Defendant Dunn. *See* Doc. 200 at 38–40. This makes sense: the Attorney General's Office has a ready team of capable attorneys who can step in to represent Defendant Dunn, some of whom already represent other defendants in this case. And even if there is some minor hardship, it must yield to the seriousness of the misconduct here. The case will remain stayed for thirty days for Defendant Dunn's new counsel to prepare to participate.

49

### E.      Findings as to Defendant Dunn

Defendant Dunn was unaware of his attorney's conduct before the court's order to show cause, so the court declines to sanction him.

### III.   CONCLUSION

The court **ORDERS** as follows:

1.      The court **PUBLICLY REPRIMANDS** attorneys Matthew B. Reeves, William J. Cranford, and William R. Lunsford for their misconduct described in this order;

2.      To effectuate their reprimand, Mr. Reeves, Mr. Cranford, and Mr. Lunsford are **ORDERED** to provide a copy of this order to their clients, opposing counsel, and presiding judge in every pending state or federal case in which they are counsel of record. They shall also provide a copy of this order to every attorney in their law firm. They must comply with this requirement within ten days from the date of this order and must certify to the court within twenty-four hours of that compliance that the requirement has been met;

3.      To further effectuate the reprimands and deter similar misconduct by others, the Clerk of Court is **DIRECTED** to submit this order for publication in the Federal Supplement;

4.      Mr. Reeves, Mr. Cranford, and Mr. Lunsford are **DISQUALIFIED** from further participation in this case;

50

5.  Mr. Reeves, Mr. Cranford, and Mr. Lunsford are **DIRECTED** to provide the Clerk of Court with a listing of jurisdictions in which they are licensed to practice law within twenty-four hours of this order;

6.  The Clerk of Court is **DIRECTED** to serve a copy of this order on the General Counsel of the Alabama State Bar and any other applicable licensing authorities for further proceedings as appropriate; and

7.  Daniel J. Chism, Lynette E. Potter, and Butler Snow LLP are **RELEASED WITHOUT SANCTION** from these disciplinary proceedings.

**DONE** and **ORDERED** this 23rd day of July, 2025.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

51